Donald K. SMITH, Plaintiff-Appellant.

v.

UNITED STATES of America et al., Defendants-Appellees.

No. 73-2453.

United States Court of Appeals, Fifth Circuit.

Oct. 7, 1974.

G. William Baab, Dallas, Tex., for plaintiff-appellant.

Charles D. Cabaniss, Asst. U. S. Atty., Dallas, Tex., Frank D. McCown, U. S. Atty., Ft. Worth, Tex., Robert E. Kopp, Michael Kimmel, Neil H. Koslowe, Dept. of Justice, Washington, D. C., for defendants-appellees.

Before GEWIN, GOLDBERG and CLARK, Circuit Judges.

**514**

GEWIN, Circuit Judge:

This federal employee discharge case was heard by the district court on cross-motions for summary judgment, and this appeal is from a decision adverse to the employee. The record before the court was the administrative record compiled in the proceedings before the Hearing Officer from the Veterans' Administration (VA) and before the Civil Service Commission. Both parties assert that the facts were fully developed and that the administrative record is sufficient to present all pertinent issues for our consideration. Appellant claims that his discharge is violative of his First Amendment right of freedom of speech. We do not find any constitutional violation, and affirm the district court.

I

We commence our analysis of the issue presented with a deep consciousness of the constitutional guaranty of free speech. As stated in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964):

[W]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

376 U.S. at 270, 84 S.Ct. at 721.

The controversy involved did not arise on the hustings, in a classroom, at a political gathering, on a public street or in a public park. It arose in a Veterans Hospital and relates specifically to the asserted right to engage in "symbolic speech" in the psychotherapeutic ward of the hospital where patients are housed who have been diagnosed as emotionally disturbed and in need of medical supervision and treatment. The appellant is not a physician. In our consideration of the issue we must look to the place, time and circumstances disclosed by the record as well as the type of conduct involved in striking the delicate balance necessary between the legitimate interests of the government and the constitutional rights of the appellant. Attention must also be given to the welfare and rights of the patients who are confined for treatment.

Appellant was a clinical psychologist at the Veterans' Administration Hospital in Dallas, Texas. He provided therapeutic treatment for veteran patients in need of emotional rehabilitation. On March 2, 1970, he began wearing on his lapel a "peace pin"[1]—a pin, about the size of a nickel, fashioned with the outline of a dove superimposed upon a replica of the American flag. Three days later appellant, Dr. Smith, was informed by his supervisor, Dr. A. J. Jernigan, that hospital policy[2] prohibited employees who were required to wear uniforms from wearing peace pins while on duty and that, in other cases, employees desiring to wear emblems should consult with their supervisors to determine the effect which the wearing of such items might have on patients and the work environment. Dr. Jernigan told Dr. Smith that he felt the prohibition against wearing peace pins on uniforms also applied to staff psychologists who wear suits or sports jackets while performing their duties at the hospital. Appellant continued to wear the pin and, on March 18, he was instructed by Dr. Jernigan

---

1. The parties stipulated at the hearing before the VA Hearing Officer that the pin in question may properly be identified as a peace pin.

2. The hospital policy was stated in the January 6, 1970, issue of "News-o-rama", a weekly news bulletin of the Dallas VA hospital:

Employees who are required to wear uniforms may not wear peace buttons, armbands, etc., while they are on duty. In other cases, the wearing of such items will be considered on the basis of the extent to which it may or may not disturb the work environment, and employees should consult with their supervisors in individual cases.

not to wear it while on duty. Dr. Jernigan reasoned that the pin might be offensive to some of the patients and that it was inappropriate to introduce any such stimulus into the patient-psychologist relationship.

Appellant refused to remove the pin and, on March 25, 1970, Dr. Jernigan sent him a "letter of admonishment." This was followed by a notice of intent to reprimand on March 31, and a reprimand on April 7. On April 14, Dr. Jernigan sent appellant a notice of proposed removal based upon the following charge: "I have instructed you not to wear a lapel pin while on duty which, in my judgment, could be offensive to patients and thus impair your effectiveness as a psychologist involved in direct patient care. You have continued to wear this lapel pin in defiance of my instructions."

Appellant requested that a hearing officer from the Veterans' Administration be appointed to conduct a hearing at the hospital on the proposed removal. A hearing was held on May 6 and 7 and Dr. Smith was represented by counsel. On May 25, Dr. J. B. Chandler, director of the hospital, informed appellant that the charge against him was sustained and that his removal would be effective May 27.

Dr. Smith did not claim a lack of understanding of hospital policy or the instructions given by his superiors. He fully understood but completely disagreed with such policy and instructions. The several conferences between Dr. Jernigan and Dr. Smith and the exchange of letters brought the issue into sharp focus. In a final attempt to gain compliance with his instructions Dr. Jernigan submitted two questions to Dr. Smith. The questions and answers are as follows:

Dr. Smith, will you assure me (Dr. Jernigan) that you will not wear a peace pin while on duty? *No, not in a thousand years!*

Is it your intention to continue to wear a peace pin while on duty? *Yes, without fail!*

Dr. Smith adamantly maintained his position and never yielded in the slightest to the requests and instructions of Dr. Jernigan. He claimed that he had worn the pin in the psychotherapeutic ward for approximately thirty days and had observed no adverse patient reaction. He did mention some comments of disapproval by co-workers. He presented no witnesses at the hearing but did present an article which demonstrated that there existed a difference of opinion by specialists in the area of inquiry. Finally he asserted that other personnel were permitted to wear replicas of the American flag in certain areas of the hospital. The record does not disclose that any other personnel wore emblems of any kind in the psychotherapeutic ward. The evidence tended to show that Dr. Smith was the only member of the staff who did so. We believe it is fair to conclude that the record reveals a direct conflict between the medical opinion of the hospital staff physicians and the opinion of Dr. Smith with respect to the conduct of a psychotherapist in the treatment of patients. As indicated earlier, Dr. Smith is not a physician.

On appeal to the Administrator of the Veterans' Affairs the decision to remove Dr. Smith was affirmed. The decision was also affirmed by the Dallas Region of the Civil Service Commission. Dr. Smith appealed this decision to the Board of Appeals and Review of the Civil Service Commission which affirmed the decision of the Dallas Region. The Board found that Dr. Chandler acted within his authority in placing on appellant the restriction against wearing the peace pin. The Board did not consider appellant's First Amendment contentions but noted that the "Board is not the proper forum for a decision of this issued [sic]. The Board does not pass on the question of the appellant's right to wear the pin but only on the question of whether the appellant

was justified in wearing it in [sic] the facts of this case in defiance of an instruction not to do so and in arriving at its decision the Board decides whether the removal action was for such cause as to promote the efficiency of the service."

## II

■ We shall consider appellant's assertion that his First Amendment right of free speech was infringed because his discharge from employment at the VA Hospital was based on his refusal to stop wearing a peace pin while on duty. Wearing such an emblem for the purpose of expressing certain views is the type of symbolic act that is within the free speech protection of the First Amendment.[3] Tinker v. Des Moines Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It is clear that the Government may not prohibit or control the conduct of a person for reasons that infringe upon constitutionally guaranteed freedoms. The approval of such restrictive action would permit the government to "produce a result which [it] could not command directly." Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, 1473 (1958). Public employment is a benefit which cannot be conditioned upon the denial of constitutional rights. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

■ The Supreme Court recognized in Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968), that the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."[4] Moreover, this court has observed that "government should be able to regulate activities which directly interfere with the proper performance of its employees' duties." Hobbs v. Thompson, 448 F.2d 456, 470 (5th Cir. 1971). However, government regulations and restrictions on the exercise of First Amendment freedoms "should not lightly be imposed." Hobbs v. Thompson, *supra.*

In a case involving the First Amendment rights of school children, Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966), this court held that the students' right to free and unrestricted expression could not be infringed upon, absent a showing that the exercise of such rights "materially and substantially" interfered with appropriate discipline in the school environment. The material and substantial interference standard was adopted by the Supreme Court in Tinker, *supra*, in which the Court held that a public school regulation which prohibited students from wearing black armbands violated the students' rights of free speech under the First Amendment, where there was no evidence that the armbands would cause substantial interference with school work.

■■ When a government employee asserts that his rights have been unconstitutionally infringed, it is necessary to

3. Appellant testified that the pin symbolized, to him, that the concept of peace and the concept of patriotism were not incompatible.

4. *See also* Goldwasser v. Brown, 135 U.S. App.D.C. 222, 417 F.2d 1169 (1969). In *Goldwasser*, a civilian language instructor at Lackland Air Force Base was dismissed because of certain statements concerning the VietNam war and anti-Semitism made by him to a class of foreign military officers taking an accelerated English course at Lackland. The Circuit Court upheld the dismissal, affirming the Civil Service Commission's determination that the Air Force's instructional goals would be jeopardized by Goldwasser's unrelated and controversial remarks. The court held that Goldwasser's First Amendment right to free speech was not violated by the limited restriction which required him to keep his opinions to himself in the context of his "highly specialized teaching assignment." 417 F.2d 1169, 1177 (1969).

strike a balance between the interests of the employee as a citizen and the interests of the government in promoting the efficiency of the services it performs through its employees. In striking that balance in the context of the First Amendment guaranty of freedom of speech, we feel that the standard of material and substantial interference is the standard to apply. In order for the government to constitutionally remove an employee from government service for exercising the right of free speech, it is incumbent upon it to clearly demonstrate that the employee's conduct substantially and materially interferes with the discharge of duties and responsibilities inherent in such employment. Battle v. Mulholland, 439 F.2d 321 (5th Cir. 1971).

"First Amendment rights must be applied in light of the special characteristics of the environment in the particular case." Clark v. Holmes, 474 F.2d 928, 931 (7th Cir. 1972), cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695. In the instant case, we feel that the evidence clearly establishes that the wearing of the peace pin by Dr. Smith while on duty resulted in a material and substantial interference with the performance of his duties as a staff psychologist charged with the duty of administering psychotherapeutic treatment to emotionally disturbed veteran patients.

At the administrative hearing before appellant's removal, Dr. T. A. McDowell, VA Hospital Chief of Staff, testified:

I think the wearing of a peace pin is certainly—has the connotation of being controversial, as far as antiwar, and I think that many of the veterans who have spent many months in the war areas, specifically VietNam, identifying in particular orthopedic patients who perhaps have had one or both legs amputated, and these individuals are counseled by a member of the Psychiatric or Psychology Service to attempt to rehabilitate them mentally, I certainly feel with such a pin

being obviously demonstrated on an individual wearing such a pin, that this could possibly be detrimental to their overall care and rehabilitation during the time they are in the hospital as this might develop into a controversial situation in their mind.

. . .

Dr. McDowell further stated:

In our opinion this pin did connotate controversy and by the wearing of the pin, it was felt yes, true, that this would be harmful and odious to some patients in psychology review.

Dr. McDowell also noted that appellant "should be aware as a Ph.D. psychologist that this type of exhibit being worn on an individual was detrimental to the welfare, or had the potential of being detrimental to the welfare of patient care."

Responding to a question as to the possibility of the pin having harmful effects on the patients, Dr. McDowell said:

If, during the period of time they are here they don't get every consideration and anything is interjected into this treatment, it is going to create all types of complex psychological reactions, because these boys have been under tremendous stress and when some issue is brought in that will be detrimental to their overall long term rehabilitation before they can go out and be useful citizens, this would, as I say, be deleterious to the overall rehabilitation of the patients and may prolong this rehabilitation and may stimulate them to a true psychiatric problem. Something of this nature might possibly be enough to tip the scale. I think there is a possibility that some of these patients might, under a great deal of tension, discussing such a controversial issue in this way, they might develop a psychiatric situation that would be extremely difficult to cope with on a long range basis. It might cause them to become aggressive, hostile. As you know, Mr. Collins, there is a thin line between sani-

ty and insanity. When these issues are brought up, this may be enough to tip the scales against the overall treatment.

Dr. Isham Kimbell, Chief of Psychiatry Service at the VA hospital, explained at the hearing why a therapist should not inject controversial issues into the patient-therapist relationship:

> . . . Over the years, in the field of psychiatry and psychology and in the area of psychotherapy and psychotherapeutic treatment, we. have learned some rather basic facts—that the therapist who is involved in dealing with patients who have emotional problems almost has to keep himself as neutral as possible in this situation. It's distracting, for instance to discuss in any great detail political issues, to interject this into therapy itself. I think wearing of such pin in a therapy situation is just as wrong as it would be if someone would have worn a Nixon button, Humphrey button, Wallace button during the 1968 campaign or any other, Masonic pin, Knights of Columbus. I think all of these things are just as well left out. This is substantially agreed upon by most people who participate in psychotherapy.

Dr. Kimbell characterized the injection of the pin into the patient-psychologist relationship as having a "distracting effect [on] the therapeutic process." Dr. Kimbell noted that ". . . perhaps the most damaging effect [would be] that it could cause a great deal of time being spent in dealing with something that may not really be appropriate to the patient's individual problem." He concluded, "I think it's always difficult for the patient to actually see what is really upsetting him when other things are introduced into the therapy situation. That's why I think that a great majority of experienced, skillful therapists avoid this sort of thing. If the patient brings it up himself, this is another point of view. This is another situation. I think that the therapist in the

therapeutic situation should avoid any set of bias, implicitly or explicitly."

The above-quoted testimony, taken at the administrative hearing and considered by the district court on the cross-motions for summary judgment, supports the rational conclusion that the injection of the peace pin into the therapeutic environment here under consideration presented a material and substantial interference with the performance of appellant's duties as a staff psychologist. This is more than the "undifferentiated fear or apprehension of disturbance" that the Supreme Court warned against in *Tinker, supra.* 393 U.S. at 508, 89 S.Ct. at 737, 21 L.Ed.2d at 739. We feel that the Veterans' Administration was justified in removing appellant from employment when he refused to conform to hospital policy.

■ The constitutional balancing in this case involves a consideration not only of the separate interests of the appellant employee as a citizen and the Veterans' Administration with its concern for efficient, orderly, and effective medical treatment, but also the interests of the patients themselves. As the district court properly noted, "[t]he patients have a right not to be subjected to a stimulus which could impair their already precarious emotional state." The Supreme Court stated in Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284, 291 (1971), that the government is able "to shut off discourse solely to protect others from hearing it . . . upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." We feel that the action of the Veterans' Administration in insulating the patients from what the hospital administration considered to be a potentially harmful stimulus was well-directed and free from Constitutional imperfections. The appellant would have been free to wear his pin when not on duty in the psychotherapeutic ward, but he could not use that area of the hospital where patients are confined for treatment as a

platform for the exercise of prohibited and unrestrained free speech whether "symbolic" or "pure" in the face of the medical opinions of his superiors that such conduct might result in harm to the very patients he is employed to assist in treating.

The able district judge quite clearly based his decision on his belief that the government had only to show a reasonable and rational connection between the conduct for which appellant was discharged and his fitness or capacity to serve. This court has on many occasions held that the "clearly erroneous" test of Rule 52(a) of Fed.R.Civ. Pro. does not apply to findings of fact based on or induced by an incorrect legal standard. *E. g.*, Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1372 n. 20 (5th Cir. 1974); Rowe v. General Motors Corp., 457 F.2d 348, 356 n. 15 (5th Cir. 1972); *see* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2585 n. 7. In the case *sub judice*, however, we do not believe that the trial court's erroneous determination regarding the legal standard by which the government's action must be measured infected or tainted his findings of fact, and therefore find it unnecessary to remand the case for reconsideration under the "material and substantial disruption" standard. *See* Davis v. Parkhill-Goodloe Co., 302 F.2d 489, 491 (5th Cir. 1962). Since the trial court's application of an incorrect legal standard did not infect or taint the findings of fact, this court is bound by the "clearly erroneous" test even though the case was tried without a jury and submitted to the district court entirely upon documentary evidence. The appellant's burden of showing that the trial court's findings of fact are clearly erroneous "is not as heavy . . . as it would be if the case had turned on the credibility of witnesses appearing before the trial judge." Sicula Oceanica, S.A. v. Wilmar Marine Eng. & Sales Corp., 413 F.2d 1332, 1333 (5th Cir. 1969). However, we should overturn the trial court's findings of fact only when "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948). See Volkswagen of America, Inc. v. Jahre, 472 F.2d 557, 559 (5th Cir. 1973). The findings of the district court are clearly supported by the overwhelming weight of substantial evidence, and the appellant has failed to demonstrate that such findings are clearly erroneous.

### III

The government claims that the district court did not have jurisdiction since the appellant sought neither reinstatement nor back pay. However, the government concedes that the district court would have had jurisdiction had appellant sought reinstatement under 28 U.S.C. § 1361 and back pay under 5 U.S.C. § 5596.

Appellant based federal jurisdiction of his action upon the Tucker Act[5] and alleged that the action was "founded upon the United States Constitution and an Act of Congress, 5 U.S.C. §§ 701 to 706." In his complaint, appellant sought damages in the amount of $10,000 and "such other relief at law and in equity to which he may justly be entitled."

In the pleadings before the district court, the appellant specifically prayed for reinstatement with back pay in his motion in opposition to defendant's motion for judgment on the pleadings and cross-motion for summary judgment. We feel that this, coupled with appellant's complaint, was sufficient to establish federal jurisdiction.

5. 28 U.S.C. § 1346(a)(2) in relevant part provides:

The district courts shall have original jurisdiction, concurrent with the Court of Claims, of any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress . . . .

In Paynes v. Lee, 377 F.2d 61 (5th Cir. 1967), we held that federal jurisdiction may be sustained if authorized by a federal statute even though such statute is not pleaded or relied upon in the district court.[6] In this case, the government was informed by appellant's cross-motion for summary judgment that he was seeking reinstatement with back pay.[7] We feel that appellant's failure to cite 28 U.S.C. § 1361 and 5 U.S.C. § 5596 and to pray specifically for reinstatement and back pay was merely a technical flaw and not a basis for denying jurisdiction in the district court.

The judgment of the district court is affirmed.

---

6. *See also* Bivens v. Six Unknown Named Agents of Federal Bureau of Investigation, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

7. *See* Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

