**C. D. (Denny) ABBOTT,**
**Plaintiff-Appellant,**

v.

**William F. THETFORD, Individually and in his official capacity as Judge of the Family Court of Montgomery County, Alabama, Defendant-Appellee.**

No. 73–1894.

United States Court of Appeals,
Fifth Circuit.

April 2, 1976.

Rehearing En Banc Granted
April 21, 1976.

Howard A. Mandell, Montgomery, Ala., for plaintiff-appellant.

Neil Bradley, Laughlin McDonald, Morris Brown, Emily Carssow, Atlanta, Ga., for Tenn. Valley Unit of Ala. Chapter of Nat'l. Assoc. of Soc. Workers, amicus curiae.

Jack Greenberg, James M. Nabrit, III, Ann Wagner, New York City, for NAACP, amicus curiae.

Richard H. Dorrough, Robert B. Stewart, Montgomery, Ala., for defendant-appellee.

Before BROWN, Chief Judge, GEWIN and GOLDBERG, Circuit Judges.*

---

\* On the presentation of certain facts by the parties the Court on its own motion raised the issue of possible mootness. We have examined affidavits and supplemental briefs as well as a joint stipulation to determine the present status.

It appears that Abbott is presently serving as Regional Director for the Florida Bureau of Detention. The stipulation also indicates that on October 20, 1975 Appellee Judge Thetford was appointed Circuit Judge of the Montgomery Circuit Court. John W. Davis, III was appointed to replace Judge Thetford as Judge of the Domestic Relations Division of the Montgomery Circuit Court.

In his supplemental brief, Judge Thetford claims that at least as to him the case is now moot, as he no longer has authority to reinstate Abbott as Chief Probation Officer for the Domestic Relations Court. In view of the fact that Abbott has made clear in his affidavit that he wants his job back, the issue is live as to him.

Several of the legal principles, such as reinstatement, pertain to the office of Judge of the Domestic Relations Division rather than to the individual holding that office. We decline, therefore, at this time to dismiss the case as moot.

But on remand, the District Court should explore the facts and issues carefully and make any necessary decisions as to partial or total mootness, considering particularly those claims against Thetford as Domestic Relations Judge and those against him in his individual capacity. As factual exploration is necessary, we intimate no views on mootness.

**JOHN R. BROWN, Chief Judge:**

On November 17, 1972, C. D. (Denny) Abbott, then Chief Probation Officer of the Circuit Court of Montgomery County, Alabama, Domestic Relations Division, filed a civil action in Federal District Court on behalf of three minor black children charging that racially discriminatory admission policies were maintained by the Alabama Department of Pensions and Security and six homes for dependent and neglected children. In response to this suit, William F. Thetford, Judge of the Juvenile Court for which Abbott was Chief Probation Officer, discharged Abbott on grounds that his action in filing the suit violated an express order of the Judge prohibiting the filing of lawsuits by staff employees. Furthermore, the Judge felt that Abbott's continued employment as Chief Probation Officer would disrupt the efficient operations of his Court. Abbott challenged his discharge in Federal Court bringing a complaint pursuant to 42 U.S.C.A. § 1983 and 28 U.S.C.A. § 1343(3). The District Court held a lengthy hearing, and on February 20, 1973, rendered an opinion dismissing Abbott's complaint. We conclude that the District Court improperly dismissed Abbott's complaint and reverse and remand.

Montgomery County's Juvenile Court is incorporated within the Domestic Relations Division of the Montgomery Circuit Court. Judge Thetford presided over the Juvenile Court and for nine years prior to his discharge, Denny Abbott had served as Chief Probation Officer. Most of the Juvenile Court's caseload is received from the Youth Aid Division of the Police Department. The Juvenile Court attempts to place dependent and neglected children in children's homes throughout the state, but the Court must depend heavily on the Alabama Department of Pensions and Se-

curity, or Welfare Office, which has primary responsibility for such placement. Private homes, mostly church operated and dependent on voluntary contributions for financial support, are the major resource for the placement of the children.

In 1972 most of these children's homes throughout Alabama remained segregated by race. There were two children's homes in Montgomery County, Brantwood, an all-white institution, and Our Lady of Fatima, an all-black home operated by a Catholic priest.[1]

As Chief Probation Officer, Abbott worked closely with the other members of the probation staff.[2] Abbott also served as the link between Judge Thetford and the probation staff, thereby necessitating a direct working relationship with Judge Thetford. While Abbott was employed on the merit system, and not at the discretion of Judge Thetford, he worked for the Judge and a degree of cooperation was necessary for efficient court operation.

### The 1969 Lawsuit

The first serious trouble between Judge Thetford and Abbott occurred in 1969. In January of that year, Abbott as next friend filed a class action suit[3] in Federal Court on behalf of five black children then being held in the detention facilities of Montgomery County. The suit sought to improve conditions at the detention facility and correct the mistreatment of black children at the Mt. Meigs Industrial School for Delinquent Negro Boys.[4]

Judge Thetford responded unfavorably to the lawsuit and suspended Abbott for 15 days for his "deliberate and willful disobedience of instructions." Abbott explained his actions in a letter to Judge Thetford prior to his suspension:

1. In 1972 Our Lady of Fatima home closed and an effort was begun by Judge Thetford to establish a new home for black children.

2. The staff included Ms. Goodwyn, the Intake Officer, Mr. Franklin, the Detention Director, and four probation officers.

3. *Stockton v. Alabama Industrial School for Negro Children,* Civil No. 2834–N (M.D.Ala., filed January 23, 1969).

4. The United States Justice Department subsequently intervened in Abbott's behalf and a consent decree was signed promising reform of the conditions at Mt. Meigs.

"I would like to assure you that my action in Federal Court was, in no way, intended to reflect upon you or the court. I am, indeed, sorry if you feel that such action was a betrayal of your trust in me. I feel that I have not betrayed my conscience or the young people of Montgomery County." Abbott returned to his position as Chief Probation Officer at the termination of his suspension and no further conflicts occurred over the 1969 lawsuit.

### Judge Thetford's 1972 Order

On September 29, 1972, Judge Thetford called a meeting in his office with the supervisory probation personnel including Abbott, Mr. Franklin and Ms. Goodwyn. Judge Thetford testified at the District Court hearing that he called the staff meeting since his suspicions of possible litigation were aroused when he was informed that Abbott had been seen frequently visiting the office of a well-known civil rights lawyer in Montgomery. An oral directive was given by the Judge concerning the filing of lawsuits by the supervisory personnel or other staff members. Abbott relayed this directive on to the other staff members. Since there was no written directive issued, varying versions of the Judge's instructions were recalled at the District Court hearing.[5]

Abbott testified that to the best of his recollection Judge Thetford had instructed the three staff members that "no personnel at the Montgomery County Youth Facility would aid, assist in the filing, or file any lawsuit in any court regarding any matter." In his complaint, however, Abbott recounted that Judge Thetford's oral directive only admonished that "no suits [are to be] filed by any personnel of the Montgomery County Youth Facilities without my prior knowledge and approval."

### 1972 Lawsuit

On November 17, 1972, Abbott filed a class action,[6] in Federal District Court, on behalf of three dependent and neglected black children seeking to integrate six all-white child-care institutions and seeking to require the Alabama Department of Pensions and Security to create more resources for black children. In no way did the suit challenge Judge Thetford's policies or official actions as judge of the Juvenile Court. Prior to filing the suit, however, Abbott did not consult Judge Thetford concerning the substance of the suit. On November 22, 1972, Judge Thetford notified Abbott by letter that he was discharged, effective immediately, for his action in filing the lawsuit.[7] Abbott brought this present

---

5. At the District Court hearing Mr. Franklin testified that:

"To the best of my recollection the judge said he didn't want us or any employee of the youth facility to file any suit or assist in the filing of any suit that would affect the operation of the Court."

Ms. Goodwyn also gave her recollection of the instructions which she passed on to her staff concerning Judge Thetford's order:

"I explained to each one of the intake officers individually that Judge Thetford had stated to the supervisors of the court that there would be no lawsuit filed by anyone connected with the court that would affect the operation of the court, nor were we to assist in the filing of any suit that would affect the operation of the court without his knowledge."

Yet Ms. Goodwyn's initial recollection when she was deposed was somewhat different:

"He said that he did not want anybody connected with the family court or youth facilities to be a party to the filing of any sort of lawsuits or assist in the filing of any lawsuits in any way."

6. *Player v. State of Alabama Department of Pensions and Security,* Civil No. 3835–N (M.D. Ala., filed November 17, 1972).

7. Judge Thetford explained his reasons for discharging Abbott in his letter of November 22, 1972.

"In yesterday morning's paper I read that as Chief Probation Officer of the Montgomery County Family Court, you have filed suit against numerous persons, including, but not limited to, the Brantwood Children's Home, the Baptist Home at Troy, the Methodist Children's Home at Selma, and the State Department of Pensions and Security. This, of course as you realize, was without prior

action as a "motion for supplemental relief" on the class action which he had filed on November 17, 1972. The District Court treated the motion as a new and separate claim.

*Constitutionality Of The Judge's Order*

We must first determine whether Judge Thetford's oral directive could constitutionally prohibit the probation personnel from filing lawsuits. The right to file a law suit is a form of communication embraced by the First Amendment which "protects vigorous advocacy, certainly of lawful ends, against governmental intrusion." *N.A. A.C.P. v. Button,* 1963, 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405, 416.

In *Button* the State of Virginia imposed criminal penalties for (1) advising persons of when their legal rights were infringed, (2) referring these persons to attorneys for legal assistance, and (3) the rendering of such legal assistance. The Supreme Court held that the State's interest in regulating barratry did not justify an unconstitutional intrusion on the NAACP's freedom of expression and association. Freedom of access to the Courts is necessary since "under the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances." 371 U.S. at 430, 83 S.Ct. at 336, 9 L.Ed.2d at 416.

Clearly Abbott and all the other probation personnel possess the right of free access to the courts for purposes of prosecuting a lawsuit. But the exercise of this acknowledged right to litigate has its boundaries as does the exercise of other First Amendment freedoms by state employees. The state has a legitimate interest in promoting the efficient operation of government and "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education,* 1968, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817.

In regulation of First Amendment freedoms of state employees, a balance must be reached between the interest of the state and the interest of the employee as a person. *Pickering v. Board of Education, supra,* 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817; *Battle v. Mulholland,* 5 Cir., 1971, 439 F.2d 321, 324. It is important to remember in striking this balance that the theory espousing the right of the state to impose any conditions, regardless of how unreasonable, on the freedoms of state employees has been rejected. *Keyishian v. Board of Regents,* 1967, 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629, 642. Furthermore, the Court has ensured the right of state employees to exercise their First Amendment rights in matters of public concern even though they may be directed at their supervisors who do not wish to contend with the employees' expressions of opinion. *Pickering v. Board of Education, supra,* 391 U.S. at 574, 88 S.Ct. at 1737, 20 L.Ed.2d at 820; *Tinker v. Des Moines Independent Community School District,* 1969, 393 U.S. 503, 511–513, 89 S.Ct. 733, 739–740, 21 L.Ed.2d 731, 740–741; *Burnside v. Byars,* 5 Cir., 1966, 363 F.2d 744, 749. See *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO,* 1973, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796, in which the Supreme Court struck the balance in favor of governmental restraints of employees' partisan political activities by upholding the constitutionality of the Hatch Act, 5 U.S.C.A. § 7324(a)(2).

In weighing the balance between Judge Thetford's oral directive and the restriction it placed on the Juvenile Court employees' right to litigate, we must consider the purpose to be achieved

consultation with me, and this suit was filed without either my knowledge or approval.

In view of your flagrant and wilful disobedience of orders, you are hereby discharged as Chief Probation Officer, Montgomery County Family Court. This discharge is effective immediately."

by the directive in balance with the degree of restriction placed on the Juvenile Court staff's exercise of their First Amendment freedoms. Judge Thetford testified that he issued the order to preserve the effective operation of the Juvenile Court. To the best of his recollection Judge Thetford testified that he told Abbott, Mr. Franklin and Ms. Goodwyn at the September meeting that he "wanted no suit filed by any member of our staff which would affect the work of the Court without my knowledge and approval." In his letter of November 22, 1972 (note 7, *supra* ) discharging Abbott, Judge Thetford reasoned that Abbott's action in filing the lawsuit against the six children's homes and the Department of Pensions and Security was in "flagrant and willful disobedience of orders." In testimony Judge Thetford explained that failure to obtain his approval for filing the lawsuit was partially the reason for discharging Abbott, the other reason being that it "affected the operation of my Court."

We have already discussed the First Amendment freedom to litigate which state employees possess. Judge Thetford's order restricted the exercise of this right by the staff of the Juvenile Court. For purposes of resolving the constitutionality of the order, we accept Judge Thetford's own interpretation of his order. During oral argument before this Court there was a great deal of preoccupation with facial overbreadth of the order as opposed to unconstitutionality as applied. On this record we feel no need to enter into this find distinction. If the order left Judge Thetford with the subjective determination as to whether a lawsuit affected the operation of the Juvenile Court then the order would be facially overbroad. Whether a lawsuit interfered with the Court operations must be determined on objective standards. There must be sufficient precision in any rule restricting First Amendment freedoms. *Hobbs v. Thompson,* 5 Cir., 1971, 448 F.2d 456, 472.

But for our purposes it is enough to hold that the order was unconstitutional as applied since the record is devoid of any evidence that the Juvenile Court was in any way interfered with by Abbott being a party to an anti-discrimination lawsuit. The record indicates that the overriding reason for the issuance of the order and subsequent discharge of Abbott was Judge Thetford's subjective dislike of the suit filed. This conclusion is reflected in the findings of fact contained in the District Judge's Memorandum Opinion. The District Judge in analyzing the different interpretations of Judge Thetford's order found that "all concerned understood that the type of suit intended to be prohibited was any suit that the Judge *felt* would affect the operation of the Court." (Emphasis added).

The proper test for determining the constitutionality of the order must be whether from an objective viewpoint the exercise of First Amendment rights disrupts and materially affects the whole operative procedures of the court. Again we stress that nothing in the record shows any disruption or interference occurred as a result of Abbott filing the 1972 lawsuit. It can be argued that Judge Thetford's discharge of Abbott only five days after the suit was filed preempted any disruption.

But the record is also devoid of any evidence that disruption *would likely have* occurred as a result of the lawsuit. Following the 1969 lawsuit filed by Abbott, the court operations suffered no disruption. There was no reason reflected by this record to support the belief that any other effect would result from the 1972 lawsuit. The mere fear or apprehension of a disturbance is not enough to justify denial of the freedom of expression. *Tinker v. Des Moines Independent Community School District,* 1969, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731, 739; *Battle v. Mulholland,* 5 Cir., 1971, 439 F.2d 321, 324. While Judge Thetford would not be required to have delayed discharging Abbott until disruption to the Juvenile Court's operations actually occurred, he must have shown sufficient facts upon which he could have reasonably forecast disruption. *Shanley v. Northeast Independent School District, Bexar County, Texas,* 5 Cir., 1972, 462 F.2d 960, 970–71.

Since the discharge of Abbott was based on nothing more than Judge Thetford's subjective apprehensions of disturbance to the Juvenile Court, we conclude that the discharge was unwarranted and in violation of Abbott's First Amendment freedoms.

### Reinstatement

■ While the equitable relief of reinstatement of state employees discharged in violation of their constitutional rights has been primarily used in teacher dismissals, the Courts have established the principle that reinstatement is a necessary element of an appropriate remedy in wrongful employee discharge cases, e. g., *Sterzing v. Ft. Bend Independent School District*, 5 Cir., 1974, 496 F.2d 92, 93; *Lee v. Macon County Board of Education*, 5 Cir., 1971, 453 F.2d 1104, 1114; *Ramsey v. Hopkins*, 5 Cir., 1971, 447 F.2d 128; *Rauls v. Baker County, Georgia Board of Education*, 5 Cir., 1971, 445 F.2d 825, 826; *Harkless v. Sweeny Independent School District*, 5 Cir., 1970, 427 F.2d 319, 324, cert. denied, 1971, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439. Judge Thetford opposed any order reinstating Abbott to his former position as Chief Probation Officer with the Juvenile Court. Judge Thetford argued that the Chief Probation Officer must be a person loyal to the Judge with whom the Judge could work in an amiable relationship. A person who would disobey direct orders of the Judge would, therefore, seriously handicap the operations of the Court.

But in assaying this we must bear in mind the nature of the order which the employee disobeyed. The law cannot tolerate the *result* of discharge on the ground of intrusion upon the close working relationship required when the cause is the disobedience of an order constitutionally impermissible facially, in part, and in application.

While we share the concern of Judge Thetford that reinstatement might revive old antagonisms, every case of reinstatement raises the possibility of ill feelings. "Relief is not restricted to that which will be pleasing and free of irritation." *Sterzing, supra* at 93.

■ Admittedly, the 1972 lawsuit was filed against the chief resources of the Juvenile Court but Abbott never challenged any of Judge Thetford's policies or rulings, administrative or judicial, in the lawsuit. The suit sought to change the policies of the Alabama Department of Pensions and Security and private children's homes over which Judge Thetford had no control. These policies of other agencies were, it is true, of significant operational consequence as Judge Thetford performed his important duties. But to attack them—also on the ground of the Constitution—was not an attack on the Judge or his Court or both. Judge Thetford can require much in the loyalty of his Chief Probation Officer and other functionaries. But the price cannot be an outright prohibition of constitutionally based suits that do not put the employee—suitor in defiance or criticism of his superior's decisions on matters other than, of course, the ban on litigation. Since Abbott's actions did not do that and antagonisms to further association must be attributed to feelings generated by the purposeful refusal to obey an order which is constitutionally unsupportable, reinstatement is equitably required.

Since the questions of backpay and attorney's fees present problems of the Eleventh Amendment, we remand for consideration in light of *Alyeska Pipeline Service Co. v. Wilderness Society*, 1975, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141; *Edelman v. Jordan*, 1974, 415 U.S. 651, 659, 94 S.Ct. 1347, 39 L.Ed.2d 662, 670; *Gates v. Collier*, 5 Cir., 1975, 522 F.2d 81; *Newman v. Alabama*, 5 Cir., 1975, 522 F.2d 71; as well as the liability for damages, backpay, etc. in light of *Muzquiz v. City of San Antonio*, 5 Cir., 1976, 528 F.2d 499 [1976] (en banc), *aff'g and rev'g in part*, 1975, 520 F.2d 993; *Warner v. Board of Trustees of Police Pension Fund*, 5 Cir., 1976, 528 F.2d 505 [1976] (en banc), *rev'g*, 1975, 522 F.2d 1384.

Reversed and remanded.

GEWIN, Circuit Judge (dissenting):

With respectful regard for the judgment of my brothers of the majority I

am compelled to dissent. I am unable to agree with the rationale articulated or the result reached in the majority opinion (sometimes *the opinion* ).

Without the least obeisance or hesitation, and in total disregard for the principles of comity and federalism, the court today has entered boldly into the chambers of the judge of a state court of record and concluded that the judge improperly discharged a member of his staff for exercising his First Amendment rights. Purporting to apply equitable principles, it has ordered the reinstatement of the discharged employee.

The majority recognizes the existence of an Eleventh Amendment problem, but never satisfactorily faces it. The court's finding of unlawful discharge necessarily engenders several thorny concomitant questions that are completely overlooked. Among these are such issues as whether Mr. Abbott is entitled to back pay; who is to make that determination; whether the Judge is individually liable if back pay is to be awarded; [1] and what, if any, conditions of reinstatement are to be imposed. Similarly ignored are the practical administrative problems with respect to the operation of Judge Thetford's court that will result from today's decision. [2] These troublesome matters will not vanish and they should not be pretermitted.

The issues decided as well as those ignored impel me to disassociate myself from this exercise of raw power which strikes a crushing blow to a state judge with autocratic overtones which are not mandated by the United States Constitution. The majority has improperly extended federal power to invade Judge Thetford's office and control the relationship between the Judge and his chief probation officer.

The opinion merely concludes that Abbott's complaint was improperly dismissed. There is little discussion of the evidence or the facts found by the district court. There is no specific holding that the facts found are not supported by substantial evidence and are clearly erroneous. There is only the conclusion that the record "is devoid of any evidence that the Juvenile Court [3] was in any way interfered with by Abbott being a party to an anti-discrimination suit." It is further concluded that "The record is also devoid of any evidence that disruption *would likely have* occurred as a result of the lawsuit." (emphasis in the original). The opinion recognizes that "while Judge Thetford would not be required to have delayed discharging Abbott until disruption to the Juvenile Court's operation actually occurred, he must have shown sufficient facts upon which he could have reasonably forecast disruption", citing *Shanley v. Northeast Independent School District, Bexar County, Texas,* 5 Cir. 1972, 462 F.2d 960, 970–71.

The foregoing conclusions require an analysis of the evidence and the facts found by the district court. The case before this court does not involve the status or welfare of minor wards of the court, white or black. The adequacy of detention facilities of the court are not an issue to be decided in this case. The issue to be determined by us is whether Judge Thetford possessed the authority to discharge the appellant Abbott under the facts and in the circumstances disclosed by the record. There is no claim of a denial of due process in the discharge. Nor is it claimed by Mr. Abbott that there is a complete insulation from discipline by a superior in all circumstances of alleged exercise of First Amendment rights. It is only claimed

---

1. This suit is against Judge Thetford both in his official capacity as Judge and individually.

2. My comments concerning Judge Thetford and the Domestic Relations Division of the Circuit Court over which he presided when this case was tried, apply to his successor in that position.

3. The court is correctly described as the Circuit Court of Montgomery County, Alabama, Domestic Relations Division. Judge Thetford was the presiding judge of that court and as such served as Juvenile Judge of Montgomery County's Juvenile Court. Judge Thetford was Mr. Abbott's immediate supervisor.

that in "the very narrow fact pattern of this case" the discharge is invalid. The lengthy opinion of the district court is reported in 354 F.Supp. 1280 (M.D.Ala. 1973).[4]

This is the third lawsuit filed by Mr. Abbott, the Chief Probation Officer serving Judge Thetford's court. The first suit was brought by him in his capacity as Chief Probation Officer of the court. The second one was brought by him as next friend of certain minor plaintiffs, but in the body of the complaint he alleged that he was the Chief Probation Officer of the court. The issues involved in those two cases are not before this court. The third lawsuit, and the one involved here, is a suit by Mr. Abbott, the Chief Probation Officer, against the Judge both in his official capacity and as an individual as noted earlier. It is undisputed on the record that as Chief Probation Officer, Mr. Abbott was the intermediate link in the chain of command between Judge Thetford and the court's staff of probation officers.

Prior to filing the 1969 lawsuit Mr. Abbott made no mention of his plans to file the suit in his capacity as Chief Probation Officer, nor did he discuss with the Judge the conditions at the detention facilities of the court in Montgomery or the conditions at the Mt. Meigs detention center that he hoped to remedy by that suit. At that time a large detention center was being constructed by Montgomery County and that construction was completed before the suit was finally concluded. On January 23, 1969 Judge Thetford wrote Mr. Abbott the following letter:

Dear Mr. Abbott:

I have completed a study of the complaint which you filed in Federal Court in the above styled cause.

You are aware of the fact that I was not informed of the filing of this suit until after the same had been filed. You are also aware of the fact that I was informed of no incidence of child mistreatment at the State Training School at Mt. Meigs prior to the filing of this suit. As Chief Probation Officer of the Family Court of Montgomery County, you also are aware of your duty to inform me of incidences of child abuse. The Family Court of Montgomery County has full authority to correct and punish incidences of child abuse and is the proper forum for such action. In your complaint you allege that detention facilities existing in Montgomery County are inadequate; while this is true, you are also aware of the fact that Montgomery County has recognized this and is in the process of spending more than eight hundred thousand dollars to correct this situation and provide people of Montgomery County with a detention facility which will be excelled by none in the nation.

As you know, over the years since I have been judge of this court, I have depended upon your integrity, trust and ability to a great extent in the operation of this court. As an officer of this court you have been granted great discretion because of the trust I had in you. Your actions as chief probation officer in withholding facts and in filing a suit in Federal Court without my knowledge is a distinct betrayal of that trust and of the court for whom you work.

(Record 490–92)

In the months following receipt of the letter, Judge Thetford expressed apprehension about publicity concerning the suit and possible damage to the image of his court. He directed Mr. Abbott to refrain from issuing press releases. Notwithstanding the Judge's directive another press release was issued and Mr.

4. The Federal Supplement dates the opinion as January 26, 1973. The opinion and order from which this appeal was taken is dated February 20, 1973 and appears in the appendix at vol. 2, pp. 650–71 (Rec. 663–84). The opinion shown by the appendix and the opinion in the Federal Supplement are identical. We are unable to explain the discrepancy in dates. The opinion which appears in Federal Supplement omits

the "Order" contained in the original opinion, which is as follows:

It is, therefore, the ORDER, JUDGMENT and DECREE of this Court that this case be, and the same is hereby, dismissed, and costs taxed against the Plaintiff Abbott, for the collection of which let execution issue.
Dated this 20th day of February 1973.

Abbott was suspended for 15 days. This suspension was later reduced to 10 days.

Informed by one of his staff members of the possibility that Mr. Abbott was planning to file another lawsuit, Judge Thetford called a conference in his office with his supervisory probation personnel in September 1972. The evidence clearly supports the finding that the staff members knew the meaning of the directive of Judge Thetford that litigation which would affect the operation of the court should not be instituted by staff members without his prior knowledge and approval. As the staff members left the conference with Judge Thetford, Mr. Abbott confirmed the Judge's suspicion by stating to another staff member that "somebody has been talking to the Judge." Slightly over 6 weeks after the conference Mr. Abbott filed the 1972 lawsuit. Immediately after the suit was filed, the following conversation transpired between Mr. Abbott and the recording clerk of the detention facility:

> "He said, 'Well, I have done it again.'
> I says, 'Done what?'
> He said, 'I have filed another suit.'
> I asked him, 'Have you lost your cottonpicking mind?'
> He said, 'No, I like to keep things stirred up.'"

With respect to the instructions given by the Judge to Mr. Abbott and other members of the staff, the district court made the following finding:

> This Court finds that all concerned understood that the type suit intended to be prohibited was any suit that the Judge felt would affect the operation of the Court. Obviously, all parties understood that the purpose thereof was to provide that the Judge have an opportunity to decide the propriety of his assigned personnel's filing suits which the Judge thought might affect the effectiveness of his Court.

354 F.Supp. at 1283.

Prior to filing the 1972 suit, Mr. Abbott never evidenced any lacked of understanding of the Judge's directive, he sought no clarification of it, and there is no evidence that he ever discussed the matter with the Judge. If he had discussed the subject with the Judge and had given valid reasons for desiring to file the suit, and if the Judge had arbitrarily and capriciously withheld consent, a different case would be presented. As to the knowledge and understanding of Mr. Abbott the district court made the following finding:

> Within approximately one month after said order, Mr. Abbott wilfully and knowingly violated the Judge's order by filing the 1972 suit against the Alabama Department of Pensions and Securities and six allegedly private children's homes in Alabama—all of which are facilities of the Thetford Court in the sense that that Court must coordinate regularly with the Department and the Court has an opportunity to place neglected children in its custody with such homes at the homes' discretion.

354 F.Supp. at 1283. Moreover, the district court stated in its opinion that Mr. Abbott admitted wilful violation of the order but contended that the order with respect to filing lawsuits infringed his First Amendment rights and "chilled" the rights of the minors for whom he brought the suit.

Concededly, administrative remedies are provided by the laws of Alabama for persons situated like Mr. Abbott. However, he elected not to pursue state administrative remedies and the district court concluded that exhaustion was not necessary. At the conference when Mr. Abbott was discharged, Judge Thetford dictated the letter of discharge quoted in the majority opinion. As the letter was dictated, he turned to Mr. Abbott at intervals to inquire whether the letter was factually correct. Mr. Abbott agreed that the factual statements in the letter were correct. He was discharged for "flagrant and wilful disobedience of orders."

All of the defendants in the 1972 suit were agencies or entities with which Judge Thetford had to deal constantly. Some were private homes, which although under no obligation to do so, had from time to time accepted dependent or neglected children at the behest of the court. The harmony and goodwill of th

officials of all of the agencies involved were in the best interest of the court and the children. It is a matter of common knowledge that lawsuits tend to discourage harmony and goodwill amongst litigants. The district court so found. 354 F.Supp. at 1284.

Two experienced family court judges testified as to the relationship between the judge of a family court and his chief probation officer. One of these judges testified that the probation officer is "the right arm of the judge." The testimony of both judges strongly supports the conclusion that the relationship between the judge and his chief probation officer must be one of confidence and cooperation.[5] One of the judges who testified stated that a suit by a family court official against the child placement agencies with which the court must deal in placing neglected and dependent children is disruptive of the effectiveness of the court. He further testified that common sense and responsibility, independent of any rule or directive, should have prevented the initiation of a suit such as that filed by Mr. Abbott.[6] Judge Thetford testified that he attempted to obtain improvements in the agencies with which he dealt by private conferences with the officials of such agencies, and that he considered a lawsuit the last resort.[7] On the other hand, Mr. Abbott indicated that he had little faith in the judge and did not consider him effective. He felt that the 1972 suit was a better method of achieving improvements. He did not consider it necessary to discuss the lawsuit with the judge or to inform him of his intention to file the suit.[8]

From my point of view, every judge who is actively engaged in the discharge of court functions knows the importance of a cooperative and confidential relationship with staff members. The absence of either cooperation or confidentiality is disruptive and inevitably impairs the operation of any court. Indeed, judges of this court are fully aware of the necessity of such cooperation and confidentiality with secretaries, law clerks, the circuit court executive, personnel in the clerk's office, and those serving in the staff attorney's office.

It is not enough to say that there are many unpleasant conditions in modern society, some of which are obviously revolting to all judges and other court personnel. The welfare of dependent and neglected children is important but it is only one of the ills of modern American society. There are problems of discrimination in employment, discrimination in the selection of juries, discrimination against the aged, unfair treatment of the poor, pollution of the environment, and a myriad of other problems. But the function of courts and personnel who work closely with judges is not to engage actively in litigation; their func-

---

**5.** Indeed the laws of Alabama provide that the records of the court here involved are to be kept confidential. Title 13, § 353, Code of Alabama 1940 (Recomp 1958).

**6.** 354 F.Supp. 1284–85.

**7.** In its opinion the district court stated:

Defendant stated that the primary reason he adopted the rule requiring his consent prior to such lawsuits being filed by his court personnel was that he had been personally working with a group of people—particularly the Montgomery Kiwanis Club, the Junior League of Montgomery, a Jewish Ladies Group, and the Montgomery Area United Appeal—in an effort to raise money to build, equip and operate a home in Montgomery for neglected black children and that he felt that the filing of such a suit would probably interfere with such a program. The Kiwanis Club had tentatively approved $30,000.00, conditioned on United Appeal's furnishing operating funds for the home. Thetford explained that one defendant in the 1972 suit, Brantwood Nursing Home, is an all-white children's home in Montgomery dependent upon the United Appeal and other private funds for support; that the United Appeal has a policy of not duplicating efforts by supporting two institutions providing the same service; and that should the 1972 suit be successful in integrating Brantwood, United Appeal's policy would forbid their furnishing operating funds for another home for the care of neglected black children in addition to Brantwood and would, therefore, defeat the planned home for black children. Without contradiction, the project has been suspended pending Abbott's suit.

354 F.Supp. at 1284–85.

**8.** *Id.*

tion is to achieve effectively the objects and purposes for which the court was created. It is quite likely that the family court of Montgomery County, Alabama, like this court and many others, has enough responsibilities in the discharge of duties regularly assigned, to tax the talents and fully absorb all of the energies of judge and court·personnel alike.

There is no evidence that Mr. Abbott had any relationship with or obligation to the children he represented. The record clearly supports the finding that two of the minor plaintiffs were unknown to Mr. Abbott; he had never even seen them. They were not wards of the court for which he worked, nor is it demonstrated that the court had any known responsibility specifically related to them. The third minor plaintiff was slightly known to Mr. Abbott, but was not a ward of Judge Thetford's court. He was a ward of a similar court in Jefferson County, Alabama. Moreover, there is nothing in the record to indicate that no one else was available to act as next friend of the plaintiffs.[9]

With the foregoing factual background and the facts found by the district court, *Abbott v. Thetford, supra,* we come to a consideration of the applicable law. First, the majority opinion is diametrically opposed to the decision of this court in *Smith v. United States,* 502 F.2d 512 (5th Cir. 1974). In *Smith* we recognized the importance of a profound national commitment to the concept that debate and the expression of opinions on public issues should be "uninhibited, robust, and wide open" and that such activity may well include vehement, caustic and unpleasant attacks upon government and public officials. In considering First Amendment rights the court is always required to look at the *place, time, and circumstances involved* in striking the necessary delicate balance between the interests of the government and the constitutional rights of the individual. A controversy that arises on the hustings at a political rally, during a debate in a classroom, on a public street or in a public park may be vastly different from those which arise in another context.

In *Smith* a clinical psychologist employed at a Veterans Administration hospital that provided therapeutic treatment for patients in need of emotional rehabilitation, insisted upon his First Amendment right to wear a "peace pin" on the lapel of his coat. To him the pin was "symbolic speech." The psychologist, like Mr. Abbott here, did not claim a lack of understanding of hospital policy nor a denial of due process. Rather, he claimed the right to wear his pin notwithstanding the opinion of his superiors that it was improper to do so in the hospital ward. *Smith* fully recognized

**9.** The district court found:

Plaintiff argues with commendable zeal, that the rights of black minors to have their civil rights vindicated and the right of Plaintiff to bring a suit to vindicate such rights outweigh any "state interest" allegedly involved. While the civil rights of all are of grave importance to this Court, no clear legitimate reason appears why the minors would have been deprived of their rights had the suit been brought by some person other than a chief probation officer of a court needing the good will of the defendants. The suit is financed by the ACLU, whose members presumably are available for nominal as well as financial support. The files and records of this Court are regularly interspersed with suits brought by members of civil rights organizations, and the organizations, as well as their members, have courageously allowed their names to be used in such litigation. The only substantial evidence offered by Plaintiff as to scarcity of persons to act as next friend for the minors was that Plaintiff went to Attorney Mandel, presumably with expectations of suing as next friend for the then delinquent minor Player, and that he agreed to act as next friend for Coefield and Scott when Father James declined to act. Suffice it to say, there was no evidence of any substantial attempt to find any next friend, other than Plaintiff Abbott, for the minors, and both Abbott's evidence and brief of the Plaintiff admit existence of a living father of one minor and a grandmother of another.

This evidence is relevant to show that the interest to be weighed against state interest in this case is the right of Abbott to file a suit for others, not the rights of the minors to have their rights vindicated. There was no substantial proof that the minors would have lost their rights had someone other than Abbott served as their next friend. 354 F.Supp. at 1287–88.

that public employment should not be conditioned upon the denial of constitutional rights and relied on *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, 1473 (1958); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). In considering the delicate balance between the right of government to regulate the activities of its employees that directly interfere with the proper performance of their duties, and the employees' right of free speech, we analyzed the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968) and our decision in *Hobbs v. Thompson*, 448 F.2d 456, 470 (5th Cir. 1971). The principles set forth in *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966), and *Tinker v. Des Moines Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) were applied. We clearly recognized that in order to justify the slightest interference with First Amendment rights there must be a showing that the exercise of such rights "materially and substantially" interfered with the duties required to be performed by an employee. As an example we cited *Goldwasser v. Brown*, 135 U.S.App.D.C. 222, 417 F.2d 1169 (1969), wherein a civilian language instructor at Lackland Air Force Base was dismissed because of certain statements concerning the Vietnam war and anti-Semitism made by him to a class of foreign military officers. There the Court held that Goldwasser's First Amendment right to free speech was not violated by the limited restriction requiring him to keep his opinions to himself in the context of his "highly specialized teaching assignment." 417 F.2d 1169, 1177.

In *Pickering v. Board of Education, supra*, the Supreme Court emphasized the "time, place and circumstances" concept when dealing with the First Amendment rights of employees. We quote:

The statements are in no way directed towards any person with whom Appellant *would normally be in contact in the course of his daily work* as a teacher. Thus no question of maintaining either *discipline by immediate superiors or harmony among coworkers* is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent *are not the kind of close working relationships* for which it can persuasively be claimed that *personal loyalty and confidence* are necessary to their proper functioning. (emphasis added)

391 U.S. at 569–70, 88 S.Ct. at 1735, 20 L.Ed.2d 818. To the same effect is this court's decision in *Pred v. Board of Public Instruction*, 415 F.2d 851, 858–59 (5th Cir. 1969).

The majority relies heavily on *NAACP v. Button*, 371 U.S. 415, 429, 83 S.Ct. 328, 335, 9 L.Ed.2d 405, 416 (1963). That reliance is misplaced. The relationship between the NAACP and the people it serves is in no way comparable to the relationship between a court and its chief probation officer. The primary issue was one of standing and the right of the NAACP to render legal assistance to certain persons and to engage in litigation on their behalf. In my view the district court properly applied the balance of interest test. *See Battle v. Mulholland*, 439 F.2d 321, 324 (5th Cir. 1971). The majority opinion did not properly apply that test, if it applied it at all.

Moreover, the opinion is both internally inconsistent and ambiguous; it is unclear whether the holding is premised upon a finding of facial overbreadth or unconstitutional application. The opinion states:

During oral argument before this Court there was a great deal of preoccupation with facial overbreadth of the order as opposed to unconstitutionality as applied. On this record we feel no need to enter into this fine distinction.

Despite this disclaimer, the majority not only concludes that "the order was un-

constitutional as applied," but also enters into an elusive and finespun distinction between the subjective and objective standards involved in Judge Thetford's action, thus embarking upon that very analysis of facial overbreadth that it purported to eschew. The court concedes that "Judge Thetford would not be required to have delayed discharging Abbott until disruption to the Juvenile Court's operations actually occurred." Nevertheless, it concludes that he had not "shown sufficient facts upon which he could have reasonably forecast disruption", and that his action was based merely upon "subjective apprehensions of disturbance to the Juvenile Court." This conclusion of subjectivity is simply not supported by the evidence. The majority itself admits that "the 1972 lawsuit was filed against the *chief resources* of the Juvenile Court"; that the policies of the agencies involved were "of *significant operational consequence* as Judge Thetford performs his important duties"; and that "the reinstatement might revive old antagonisms." (emphasis added) These factors clearly provide an adequate objective foundation for Judge Thetford's conclusion that disruption was likely.

It is impossible to support the conclusion that Judge Thetford's directive about the filing of lawsuits is not related to the court's policies or is not an administrative ruling. In my view it is both a statement of policy and an administrative ruling.

The rationale of the majority is vague, indefinite, uncertain and ambiguous. It totally overlooks the fundamental requirement of cooperation and confidence between a judge and his chief probation officer in the discharge of vital responsibilities affecting the lives and welfare of dependent and neglected children. Not only was Mr. Abbott's conduct a violation of the principle of cooperative responsibility, trust and confidence, it constituted insubordination and a total disregard for the welfare of Judge Thet-

ford's court. *See Beilan v. Board of Pub. Ed.*, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958); *Nelson v. Los Angeles County*, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960); *Lefcourt v. Legal Aid Society*, 445 F.2d 1150 (2d Cir. 1971); *NLRB v. R. C. Can Company*, 340 F.2d 433 (5th Cir. 1965); *NLRB v. Soft Water Laundry, Inc.*, 346 F.2d 930 (5th Cir. 1965).

If this court had correctly decided the issues presented, there would be no necessity of considering the troublesome Eleventh Amendment issue involved in reinstatement and back pay. As a matter of fact the opinion only mentions the problem; it makes no effort to solve it.

Finally, if this court is to extend the reach of federal power as evidenced by the majority opinion, it would be well advised to avoid decisions that invade the chambers of a state court judge, strike down his administrative rulings and require the court over which he presides to continue the employment of a willfully disobedient employee. This is especially true in the case of an employee whose primary duty is to cooperate with the judge, preserve the confidential and harmonious relationship between the judge and other staff members, and use his energy and talents in the discharge of the serious duties imposed by law upon the court. The personal desires, ambitions or motives of Mr. Abbott must not dominate or interfere with the functions of the court or impair the relationship between the judge and staff members. It is evident that Judge Thetford's court, regardless of who may serve as presiding judge, must continue to deal with sad and tragic problems involving the lives and welfare of dependent and neglected children. That court must have the services of a chief probation officer who is fully cooperative and who will follow the judge's reasonable administrative directives, and whose service and activity will preserve confidence in the court. The judgment of the district court should be *affirmed*.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, WISDOM, GEWIN, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE and TJOFLAT, Circuit Judges..

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.