REVISED DECEMBER 21, 2004

United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 1, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-50230

COMMUNICATION WORKERS OF AMERICA; URBANO HERRERA,

Plaintiffs-Appellees,

versus

ECTOR COUNTY HOSPITAL DISTRICT, doing business as Medical
Center Hospital; ET AL

Defendants

ECTOR COUNTY HOSPITAL DISTRICT, doing business as Medical
Center Hospital

Defendant-Appellant

--------------------
Appeal from the United States District Court
for the Western District of Texas
--------------------

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Appellee Urbano Herrera, a carpenter employed by the Ector County Hospital District (the "Hospital"), was disciplined by the Hospital after he wore a "Union Yes" lapel button in violation of the Hospital's dress code. Herrera brought suit under § 1983, claiming that the anti-adornment provision of the dress code policy violated his First Amendment rights. The district court granted a motion for judgment as a matter of law ("JMOL") filed jointly by intervening plaintiff Communication Workers of America ("CWA", or

the "Union") and Herrera (collectively, "Plaintiffs"), awarding monetary damages and injunctive relief. The Hospital now appeals, advancing numerous errors by the district court, including its ruling that Herrera's wearing of the union button was speech on a matter of public concern, its refusing to submit specified factual questions to the jury, and its awarding of attorneys' fees and litigation costs to Plaintiffs. We affirm.

## I. Facts and Proceedings

While employed by the Hospital as a carpenter, Herrera became a volunteer organizer for the CWA. As his and other CWA members' organizing efforts progressed, more and more Hospital employees began to attend weekly union meetings at Herrera's home. Eventually, 37 Hospital employees became dues-paying members of the Union. At one such meeting, Herrera and other Hospital employees who supported the Union's organizing efforts received "Union Yes" lapel buttons from CWA representatives. Herrera and others decided to wear the buttons during their work shifts at the Hospital in knowing violation of the Hospital's dress code, which contains a specific non-adornment prohibition that forbids the wearing of most such insignia.

While wearing the "Union Yes" buttons during their work shift, Herrera and a co-worker were confronted by a supervisor who informed the pair that the buttons violated the dress code and asked them to remove the buttons. Herrera refused to remove his

2

button. Subsequently, while Herrera was in the Hospital's cafeteria on break, he was confronted by his direct superior, John Durham, and again instructed to remove the button. Durham did not back off, and after the tenor of the confrontation elevated, Herrera eventually told Durham that "I'm not going to take it off. If you want it off, then you take it off." When Herrera was then instructed by Durham to accompany him to his office, Herrera pumped his fist in the air and shouted "union up!" as he followed Durham out of the cafeteria.

After Herrera arrived at Durham's office, he read the dress code and removed the union button. Herrera thereafter decided to put the button back on, after he telephoned a CWA representative and was assured that he could not be required to remove the button. Following yet another confrontation with Durham, who again insisted that the button be removed, Herrera was advised that he would be suspended for three days without pay for his refusal to remove the button. His disciplinary record was expanded to reflect the incident. Because of his being disciplined, Herrera received only a 3% annual raise, rather than the usual 4%.

Herrera filed the instant action pursuant to § 1983, seeking (1) compensation for lost pay and benefits, (2) an injunction prohibiting future enforcement by the Hospital of its policy against the peaceable wearing of pro-union buttons by Herrera and other union supporters, (3) declaratory relief holding the Hospital's ban on the peaceable wearing of pro-union buttons to be

3

unconstitutional, and (4) attorneys' fees.  The Union intervened as a co-plaintiff.  The Hospital filed a Motion to Dismiss and, in the alternative, a Motion for Summary Judgment.  Plaintiffs responded by filing a Motion for Partial Summary Judgment.  In adjudicating the various summary judgment motions, the district court concluded that: (1) Herrera's speech was on a matter of public concern; (2) this speech was a substantial or motivating factor in the adverse employment actions he suffered; and (3) the Hospital would not have taken those adverse actions absent the protected speech.[1]

The district court also concluded, however, that more evidence would have to be adduced for the Court to complete the balancing test required by Pickering v. Board of Education[2] and Connick v. Myers.[3]  This test is conducted to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[4]  The district court stated that it needed more information before it could determine (1) the extent

---

[1] See Communications Workers of Am. v. Medical Ctr. Hosp., 241 F. Supp. 2d 601 (E.D. La. 2002) ("CWA I").

[2] 391 U.S. 563 (1968).

[3] 461 U.S. 138 (1983).

[4] Pickering, 391 U.S. at 568.

4

of Herrera's interaction with the public during his work hours,[5] and (2) the disruptive effect, if any, of his wearing the button on the Hospital's operations.

Before the jury trial began, the district court ruled on the basis of the summary judgment record that Plaintiffs had carried their burden of establishing a prima facie case of a Constitutional violation. Therefore, ruled the district court, the Hospital had the burden of producing evidence on the remaining questions that had been left unresolved in the summary judgment and remained necessary for the completion of the Pickering/Connick balancing test, viz., whether Herrera's employment involved significant interaction with the public and whether his actions threatened to disrupt the Hospital's operations.

Following completion of the Hospital's case at trial, Plaintiffs filed a motion for JMOL, which the court granted.[6] The Hospital timely filed a notice of appeal, contesting virtually every factual finding, legal conclusion, and procedural ruling made by the district court.

## II. Analysis

A. Standard of Review

---

[5] We have considered this factor in the past, as it must necessarily influence the determination of how the speech at issue impacts the public entity's operation. See, e.g., Smith v. United States, 502 F.2d 512 (5th Cir. 1974).

[6] See Communications Workers of Am. v. Ector County Hosp. Dist., 241 F. Supp. 2d 617 (W.D. Tex. 2002) ("CWA II").

We review de novo a district court's ruling on a Rule 50(a) Motion for JMOL, applying the same standard as the district court. In so doing, we review the entire record in the light most favorable to the non-movant and draw all reasonable inferences in favor of that party.[7] A district court "may not grant a Rule 50(a) motion 'unless a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"[8]

We review a grant of injunctive relief for abuse of discretion; findings of fact for clear error; and conclusions of law de novo. When fashioning its injunctive relief, a district court abuses its discretion if it (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the factual or legal conclusions.[9] We review awards of attorneys fees and costs for abuse of discretion.[10]

B.  Substantive Issues Raised by the Hospital

At the heart of this case lies the question whether the Hospital's decision to discipline Herrera violated his rights to

---

[7] See, e.g., Delano-Pyle v. Victoria County, 302 F.3d 567, 572 (5th Cir. 2002).

[8] Id. (quoting Ellis v. Weasler Eng'g, Inc., 258 F.3d 326, 337 (5th Cir. 2001)).

[9] Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir. 1995).

[10] Alameda Films S A De C V v. Authors Rights Restoration Corp., Inc., 331 F.3d 472, 483 (5th Cir. 2003).

freedom of speech or freedom of association guaranteed by the First Amendment. The Hospital contends that the anti-adornment component of its dress code is content-neutral and does not implicate free speech or free association. The anti-adornment policy states that "ONLY pins representing the professional association and the most current hospital service award may be worn."[11] Plaintiffs counter that this policy, as applied by the Hospital, effectively affixes conditions to public employment that violate the First Amendment expression rights of Hospital employees such as Herrera and others similarly situated.

---

[11] The dissent bases much of its argument on the alleged content-neutrality of the dress code. This argument is belied by the language of the dress code itself and the hospital's arguments. As noted by the dissent in its discussion of Police Department of City of Chicago v. Mosley, in which the Supreme Court struck down a city ordinance that prohibited all picketing within 150 feet of a school except peaceful picketing of a school involved in a labor dispute, "[t]he central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter . . . The operative distinction is the message on a picket sign." 408 U.S. 92, 95 (1972). Here, the operative distinction is the message of the button. The dress code allows Hospital employees to wear buttons that represent the professional association or the current Hospital award. In contrast, buttons with any other messages on them are forbidden by the dress code. Further, the record reflects that "employees are allowed on certain occasions to wear pins pertaining to the Great American Smoke-Out Day, blood donations, and the annual Permian Basin High School versus Odessa High School football game." CWA I, 241 F. Supp. 2d at 607. Thus, the Hospital's dress code categorizes buttons based on their content, as did the regulations in Mosley.
 Further, as we note below, even the Hospital recognizes that the dress code affects the content of the buttons when it argues that even if we were to assume that the subject of the "Union yes" button is of public concern, the content of this particular button renders it unprotected. See infra note 31.

7

Although government employees "have not relinquished the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest,"[12] the government as employer is entitled to manage employees to an extent that includes hiring, firing, and disciplining them.[13]  When a public employer adopts a policy that impinges on the speech of its employees, though, we apply the Pickering/Connick balancing test, weighing the interests of the employee, as a citizen, to comment on matters of public concern against the interests of the government, as an employer, to promote efficiency in its providing of services.[14]

In this circuit, we have integrated that balancing test into a larger four-step analysis:  First, the employee must demonstrate that the speech at issue addressed a matter of public concern.  If it can be characterized as such, we next apply the Pickering/Connick balancing test, thereafter continuing to the final two steps only if we conclude that, on balance, the public employee's speech rights outweigh the public employer's interest in the efficient providing of services.  These first two steps are "legal in nature and are for the court to resolve."[15]  The third and fourth steps are factual in nature, requiring determinations first

---

[12] United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995) (citations and internal quotations omitted).

[13] See Waters v. Churchill, 511 U.S. 661, 671-74 (1994).

[14] Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).

[15] Branton v. City of Dallas, 272 F.3d 730,739 (5th Cir. 2001).

whether the protected speech was a substantial or motivating factor in the adverse employment decision; and, second, if it was, then whether the employer would have made the same employment decision in the absence of the protected speech, a "but for" inquiry.[16]

1. Deprivation of a Constitutional right in the exercise of an "official policy."

As a preliminary matter, we must determine whether the dress code is an "official" Hospital policy, for local governmental entities may be held liable under § 1983 only if deprivations of rights result from implementation of an official policy or custom.[17] It is thus error to assess liability to a local governmental unit for employment and personnel decisions made by officials who lack final policymaking authority in that area.[18] Here, the Hospital argues in its appellate brief that Durham, the supervisor who actually disciplined Herrera, has "no policymaking authority, much less *final policymaking* authority." Therefore, urges the Hospital, "no *final policymaking* authority was involved in the decision to suspend Herrera," so there can be no liability here at all.

The precedent relied on by the Hospital, however, addresses factual circumstances distinguishably different from those that frame the instant case. <u>Pembauer v. City of Cincinnati</u>, for

---

[16] <u>Id.</u>

[17] <u>See, e.g.</u>, <u>Bd. of the County Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997).

[18] <u>See, e.g.</u>, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112 (1988); <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986).

example, addresses when "municipal liability may be imposed <u>for a single decision</u> by municipal policymakers."[19]  Similarly, <u>City of St. Louis v. Praprotnik</u> deals with "defin[ing] the proper legal standard for determining when <u>isolated decisions</u> by municipal officials or employees may expose the municipality itself to liability" under § 1983.[20]  Those cases, in other words, dealt with isolated acts that arguably were outside "official" policy; and, under such circumstances, it is appropriate to determine whether the state actor involved had "final policymaking authority" that would expose the municipality to liability.

It is well settled, however, that a municipality may be held liable if its "official policies cause [its] employees to violate another person's constitutional rights."[21]  In other words, a municipality may be held liable if it "cause[s] a constitutional tort through 'a policy statement, ordinance, regulation, or decision <u>officially adopted and promulgated</u> by that body's officers,'"[22] even if that official policy is <u>enforced</u> by someone who has no final policymaking authority.  This last fact does not change the character of the alleged injury or the policy under which that injury occurred; it is still an "injury ... inflicted by

---

[19] <u>Pembaur</u>, 475 U.S. at 480 (emphasis added).

[20] <u>Praprotnik</u>, 485 U.S. at 114 (emphasis added).

[21] <u>Id.</u> at 122.

[22] <u>Id.</u> at 121 (<u>quoting</u> <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 690 (1978)) (emphasis added).

a government's 'lawmakers or by those whose edicts or acts may fairly be said to represent official policy,'" for which "municipalities [can] be held liable."[23]  The crucial question, therefore, is whether the dress code is an official policy of the Hospital, not whether the Hospital employee who enforced the terms of that policy had final policymaking authority.

That the Hospital's dress code is an "official policy" is not seriously contested.  Instead, the Hospital misleadingly focuses on the decision-making authority of its employee, Durham.  As Plaintiffs correctly point out, though, the dress code policy (1) was adopted by the Hospital's Administrator and its Dress Code Committee, (2) bears a policy number, MCH-1027, and (3) was officially revised in July 1999.  Furthermore, some members of the Hospital's Board of Directors — the very entity identified by the Hospital as its official, final policymaker — stated in affidavit testimony that the dress code was valid and enforceable.  And, finally, if the dress code was not an official policy or was otherwise invalid, the Hospital had several opportunities to disavow it during Herrera's disciplinary process, but never did.

These factors fully support the conclusion that, at the very least, the "final policymaker" identified by the Hospital (the Board) delegated the authority to establish the dress code to the Administrator.  As the Supreme Court explained in Pembauer, "if the

_____

    [23] Praprotnik, 485 U.S. at 121-22 (quoting Monell, 436 U.S. at 694).

11

Board delegated its power to establish final employment policy ... the [delegate's] decisions would represent county policy and could give rise to municipal liability."[24] We conclude that, at a minimum, such a delegation occurred in the instant case, and that the Administrator's establishment and promulgation of the dress code constitute official Hospital policy.

2. The subject of Herrera's "speech": Public concern or personal issue?

We have never before decided expressly whether pro- or anti-union lapel pins constitute speech on a matter of public concern, although we assumed that they do in U.S. Department of Justice, Immigration and Naturalization Service v. Federal Labor Relations Authority.[25] Noting that we have never explicitly made such a holding, the Hospital insists that, in wearing the pin, Herrera was speaking as an employee, not as a citizen, on "matters that address only his personal interest and personal employment conditions." The Hospital's repeated assertions on this point —— that Herrera's speech "only related to the terms and conditions of [Herrera's] employment and duties ... [it] related solely to his employment and not to a matter of concern to the community" —— simply do not hold water.

First, the speech at issue, constituting as it did a show of support for the union and serving as it did to inform other

_____

[24] Pembaur, 475 U.S. at 484, n.12 (emphasis in original).

[25] 955 F.2d 998, 1005 (5th Cir. 1992).

12

employees (and those members of the public who saw it) that a union organizing drive was in progress, indisputably concerned the employment terms and conditions of <u>all</u> potential union members, not just Herrera. Furthermore, the goals of union organizing at a functioning public facility will almost always entail potential costs and benefits that directly affect and concern the community at large, not just the employment conditions of that facility's workers. A successful union organizing drive can lead to price fluctuations for services provided by the facility, changes in the types of services offered by the facility, and political pressures centered around worker satisfaction.[26] Obviously, then, it is simply incorrect to characterize a "Union Yes" button as addressing issues that are "solely and inherently personal."

Second, as the district court noted in its summary judgment order, courts that have considered this question have typically held that speech regarding union activities is speech on a matter of public concern. In <u>Boddie v. City of Columbus</u>, for example, we recognized the "reality that speech in the context of union activity will seldom be personal; most often it will be political

---

[26] Although public employees in Texas may not strike or engage in collective bargaining, public employee unions may act collectively in the political arena, by raising awareness of employees' complaints, increasing voter participation, and educating members politically. There is record evidence that CWA members have actively pursued these options, by staging a demonstration, attending an Ector County Hospital District ("ECHD") Board meeting, filing grievance letters on behalf of CWA members, and, in the case of one member, running for a position on the ECHD Board.

13

speech."[27]  Similarly, the D.C. Circuit has noted that "[t]he urge to unionize certainly falls within the category of expression that is 'fairly considered as relating to any matter of political, social, or other concern to the community ...'"[28]  And, in <u>Thornhill v. Alabama</u>, the Supreme Court stated that "labor relations are not matters of mere local or private concern."[29]  Although the Hospital cites case law indicating that publicizing a personal employment grievance is not speech on a matter of public concern,[30] Herrera was not trying to publicize a <u>personal</u> employment grievance: Nothing in the record of this case would indicate that the "Union Yes" button was related to anything other than the ongoing organizing effort.

In contrast, the cases relied on by the district court and cited on appeal by Plaintiffs support the conclusion that speech regarding general union activities <u>is</u> speech on a matter of public

---

[27] 989 F.2d 745, 750 (5th Cir. 1993).  This "political" view of Herrera's speech is particularly appropriate in the instant case, as CWA has engaged in political activities on behalf of Hospital employees.  <u>See</u> note 25, <u>supra</u>.

[28] <u>American Postal Workers Union, AFL-CIO v. United States Postal Serv.</u>, 830 F. 2d 294, 301 (D.C. Cir. 1987) (<u>quoting</u> <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)); <u>see</u> <u>also</u> <u>McGill v. Bd. of Educ.</u>, 602 F.2d 774, 778 (7th Cir. 1979)("her complaint alleges that the reason for her transfer was advocacy of a collective bargaining agreement ... Judge Morgan evidently concluded that this speech involved a matter of public concern, and we agree.").

[29] 310 U.S. 88, 103 (1940).

[30] <u>See, e.g.</u>, <u>Teague v. City of Flower Mound</u>, 179 F.3d 377, 383 (5th Cir. 1999)("During all relevant events, Teague and Burkett were acting in their capacity as employees embroiled in an employment dispute.  Their focus ... was primarily on clearing their names, not on rooting out police corruption <u>per se</u>.").

14

concern.[31]  We easily conclude that Herrera's wearing of the union lapel pin is appropriately classified as speech regarding general union activities, not speech publicizing a personal employment grievance, and is therefore speech on a matter of public concern.

The Hospital attempts to make a corresponding argument that the speech at issue here ("Union Yes") did not <u>sufficiently inform the public</u> as to be helpful, so that even if the <u>subject</u> of the speech is of public interest, the <u>content</u> of this particular communication renders it unprotected.[32]  The Hospital also contends that Herrera's limited contact with the public supports its argument on this point.  We disagree on both contentions.  The very fact that a union organizing drive was <u>occurring</u> at the Hospital is particularized information about which the public may be interested, and that information, as well as the viewpoint championed by those who wear the button, is adequately conveyed by the words "Union Yes."  As for Herrera's limited contact with the public, we have held that speech on a matter of public concern can be protected, even if that speech occurs only in the workplace.[33]

_____

[31] <u>See</u> note 27, <u>supra</u>, and accompanying text.

[32] <u>See</u> <u>Wilson v. City of Littleton</u>, 732 F.2d 765, 768 (10th Cir. 1984)(<u>discussing</u> <u>Connick v. Myers</u>, 461 U.S. 138 (1983)).

[33] <u>See</u> <u>Branton v. City of Dallas</u>, 272 F.3d 730, 740 (5th Cir. 2001).  In <u>Branton</u>, however, the employee at issue had a duty to report false testimony of other police officers (the subject of the speech at issue), which fact clearly influenced the court's analysis: "Although Branton's speech occurred at work, ... Branton had not only an invitation but a duty to speak." <u>Id.</u>  However, the <u>Branton</u> panel also noted that "Neither the [First] Amendment itself

15

Moreover, the Hospital undercuts its own argument by acknowledging that Herrera did come in contact with members of the public (albeit not in any interactive capacity), such as, for example, at the cafeteria, in the hallways, and on the stairs.[34]  Ironically, in addressing the Pickering/Connick balancing test, the Hospital inconsistently argues that Herrera had "frequent and direct" contact with the public.  Yet the Hospital conceded in its Trial Brief that Herrera's employment "does not entail significant interaction with the public" (emphasis added).[35]  For non-spoken "speech" to be communicated, it is visibility by the public that satisfies; interaction is not required.

3.  The Pickering/Connick balancing test.

---

nor our decisions indicate that ... freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."  Id., quoting Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979).

[34] Similarly, the dissent undercuts its own argument on this point and attempts to have it both ways.  The dissent argues that assuming that the speech here is on a matter of public concern, "it is so only in a very weak and attenuated sense" because "it addresses no specific matter."  In its discussion of the employer's right to project "an appearance to the public of neutrality and impartiality," however, the dissent relies heavily on the message of the button, noting that "any reasonable patient, visitor, or other member of the public, and any reasonable co-employee, will understand the button with the written message on it as an attempt by its wearer to communicate the content of the message . . . That, of course, is the point of the button."  If the button's message addresses "no specific matter," there is truly no concern that it would compromise the Hospital's neutral and impartial image.

[35] See note 43, infra, and accompanying text.

16

The thrust of the Hospital's argument on this second step of our test is that the dress code policy is "entitled to deference" because it is "critical to the Hospital's mission in that it creates an appearance of impartiality and promotes uniformity, discipline, and esprit de corps among the hospital's employees."[36] Although the Hospital lifts this argument almost verbatim from this circuit's precedent on non-adornment policies similar to the one here at issue, that precedent deals in large part with public employers that are law enforcement agencies or other "paramilitary"

---

[36] Paraphrasing almost verbatim our opinion in United States Dep't of Justice v. Federal Labor Relations Authority, another law enforcement case discussed infra at notes 37–40 and accompanying text.

The dissent misconstrues the action before us, and, as a result, relies heavily on cases that are procedurally inapposite to the suit here. The dissent argues that the matter before us concerns the constitutionality or unconstitutionality of the Hospital's dress code. This, however, misses the mark. What is before us is a Section 1983 damages action that attacks the constitutionality of the dress code as it applies to Herrera's (and other similarly situated employees') speech. The dissent's reliance on United States Civil Service Commission v. National Association of Letter Carriers AFL-CIO, 413 U.S. 548 (1973), and Broadrick v. Oklahoma, 413 U.S. 601 (1973), is thus misplaced. In both cases, the plaintiffs challenged the constitutionality of the federal and state statutes as unconstitutional on their face, including overbreadth and vagueness challenges. That is not the issue before us. Indeed, in Broadrick, the Court noted that the plaintiffs argued that the Oklahoma statute in question applied to protected political expression such as the wearing of political buttons. 413 U.S. at 608. The Court rejected this argument, noting (1) that plaintiffs had not engaged in that type of activity, and (2) that plaintiffs could not invoke the overbreadth doctrine "on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." Id. at 609-10. Thus, because plaintiffs had not engaged in the wearing of political buttons, they could not assert that the challenged statutes encompassed such activity. See id. at 610.

17

organizations.  Thus, that precedent is inapposite and provides

scan — if any — support for the Hospital's argument.

In Daniels v. City of Arlington,[37] for example, we explained

that:

> [T]he city ... has the right to promote a disciplined,
> identifiable, and impartial police force by maintaining
> its police uniform as a symbol of neutral government
> authority, free from expressions of personal bent or
> bias.  The city's interest in conveying neutral authority
> through that uniform far outweighs an officer's interest
> in wearing any non-department-related symbol on it.[38]

This reasoning rests almost entirely on the key fact that a police

force, as the only arm of municipal government that is authorized

to use force on citizens, must avoid any appearance of favoritism

or bias and — just as important — any signal that might cause

confusion as to who is and who is not a law enforcement officer.

This reasoning was also the foundation of a case cited by the

Daniels panel (and misguidedly cited by the Hospital here), U.S.

Department of Justice, Immigration and Naturalization Service v.

Federal Labor Relations Authority.[39]  There, we explained that "the

border patrol .... is a para-military law enforcement unit, and as

such, has many of the same interests as the military in regulating

---

[37] 246 F.3d 500 (5th Cir. 2001).

[38] Id. at 504.  The Daniels panel had already determined that
the speech at issue there — a Christian cross worn on the lapel —
was not speech on a matter of public concern and was therefore not
protected by the First Amendment, so this language is essentially
dicta.

[39] 955 F.2d 998 (5th Cir. 1992).

18

its employees' uniforms."[40]  Because of this similarity of mission and means between the military and the INS, our <u>FLRA</u> panel held that the border patrol's anti-adornment policy was "similarly entitled to deference."[41]

This reasoning simply does not apply to the instant situation, despite the Hospital's close emulation of the language from <u>FLRA</u> in an apparent effort to bolster its claim that its dress code policy is entitled to such deference.  The paramilitary reasoning of our FLRA opinion cannot be stretched to apply to the non-medical, non-administrative, maintenance and clerical staff of a public hospital.  The wearing of a pin by a carpenter and other Integrated Services employees, who are merely seen by, but do not interact extensively with, members of the public, cannot be seriously said to undermine (1) the public's perception of neutrality and impartiality among the Hospital's professional and quasi-professional medical and administrative staff, or (2) the esprit de corps among these kinds of employees.[42]  As Plaintiffs accurately

---

[40] <u>Id.</u> at 1004 (emphasis added).

[41] <u>Id.</u>

[42] The "esprit de corps"/unity argument rings especially hollow when viewed in light of the Hospital's policy of permitting fans of two local high school football teams (Odessa and Permian Basin) to wear adornments supporting the schools at the time of their annual football showdown.  This rivalry is famously intense (<u>see</u> H.G. BISSENGER, FRIDAY NIGHT LIGHTS (1990)), and pins supporting or denigrating either of the two teams would seem to be just as if not more divisive than a "Union Yes" button.  Indeed, this smacks of impermissible selectivity based on the <u>content</u> of the speech in question.

19

note, this case lacks the unique circumstances and requirements of para-military and law enforcement organizations.  Even though the Hospital's carpenters, plumbers, janitors, and other maintenance staff are glimpsed from time to time by patients, family members, and visitors, they do not interact directly with them; neither are such employees ever called on to enforce or administer the health care laws of the state.  The Hospital's efforts to obscure the clear line between these classes of employees by painting with too broad a brush is feckless.

The other cases relied on by the Hospital are similarly distinguishable, and equally inapposite.  In <u>Smith v. U.S.</u>,[43] for example, we found no constitutional violation when a psychologist at a Veteran's Administration hospital was discharged after he refused to remove a pin depicting a dove (a ubiquitous peace or anti-war symbol) superimposed on an American flag.  That incident occurred at the close of the Vietnam War, and the case was decided on the basis of trial testimony that some of the Vietnam veterans who were being <u>treated personally</u> by the psychologist were quite likely to find the pin upsetting, which in turn would be detrimental to such patients' welfare.[44]  This is a circumstance unique to the treating psychologist/patient relationship and obviously cannot be analogized to apply to a carpenter who has no

---

[43] 502 F.2d 512 (5th Cir. 1974).

[44] <u>Id.</u> at 517–18.

meaningful contact with patients or their families. Again, the bright line between medical staff and blue collar maintenance employees cannot be crossed.

Undaunted, the Hospital nevertheless contends that "Herrera had frequent and direct contact with the public," and furthermore that if we were to accept that he did not have such contact, then his speech could not have been on a matter of public concern. In so doing, the Hospital attempts to manufacture a Catch-22 for the Plaintiffs by arguing that they are "attempting to have it both ways" by arguing that Herrera had enough public contact to make his speech on a matter of "public concern," but not enough public contact for purposes of the Pickering/Connick balancing test. On the contrary, it is obviously the Hospital that is trying to have it both ways. In its argument on the "public concern" element, the Hospital contends that "Herrera admits he did not have any significant contact with the public" (emphasis added); a point actually conceded by the Hospital in its original Answer when it admitted that Herrera's "position of employment with Defendant Hospital does not entail significant interaction with the public" (emphasis added). As shall be seen, the difference between contact and interaction is telling. The district court declined to give conclusive effect to that admission because all the parties "seemed to have overlooked [it]" in their arguments before that court,[45]

_____

[45] CWA II, 241 F. Supp. 2d 617, 626 (W. D. Tex. 2002). The district court based this decision on White v. ARCO/Polymers, Inc.,

21

which nevertheless observed that the admission was "highly indicative of the Defendants' stance on this issue before it became critical to the case."[46] The definitive aspect of the Hospital's schizophrenic posturing here is its conflating of two very different aspects of Herrera's presence, vis-à-vis the public: (1) "contact" that is passive visibility that facilitates "speech", and (2) direct "interaction" which, if present, might affect the public's perception of his employer's neutrality.

In stark contrast to the Hospital's flawed comparison, Plaintiffs' position is neither inconsistent nor internally contradictory. They accurately assert that "Herrera's position does not entail significant interaction with the public. ... [Herrera] worked in patient rooms that had been vacated for repairs or renovation. ... [Herrera] only encountered the public in passing, such as brief encounters in the hallways, elevators, or cafeteria" (emphasis added). Such contacts, however fleeting, are quite sufficient for Herrera's lapel pin to alert the public to the fact that a labor organizing drive is ongoing, but fall well short of the active, functional interaction (such as that between law enforcement officers and the public or psychiatrists and their patients) needed to affect negatively the Hospital's medical or

---

720 F.2d 1391, 1396 (5th Cir. 1983), which states that "fail[ure] to contend that [a party's] admissions barred []subsequent assertion of the contrary position ... effectively waived the argument that the issue was irreversibly settled."

[46] CWA II, 241 F. Supp. 2d at 626.

administrative operations. Passive visibility and active interaction weigh quite differently on the <u>Pickering</u>/<u>Connick</u> balancing beam. The nature of Herrera's performance of his employment as a carpenter, with the frequency of its visibility and the infrequency of its interaction with the public, is such that the Hospital has failed to demonstrate how suppressing the lapel-pin speech of personnel like Herrera was necessary for the efficient providing of Hospital services.

The Hospital also argues that Herrera's speech had the effect of workplace disruption, which is a factor to be considered in conducting the balancing test. The Hospital would emphasize the anecdotal incident when Durham instructed Herrera to remove the button and Herrera responded with "If you want it off, then you take it off."[47] On this point, the district court ruled:

> Just as other courts have found that 'refusing to obey an order that implicates an employee's First Amendment rights is not a sufficient reason for disciplining the employee,' this Court holds that an employer's insistence upon enforcing an unconstitutional policy cannot create the very disruption the policy purports to prevent.[48]

The district court also recognized that the button-wearing <u>speech</u> at issue here caused no workplace disruption, either in the Durham

---

[47] Appellant also briefly argues that this statement, as well as Herrera's shouting "Union up" as he was escorted from the cafeteria, amount to an attempt by Herrera to elevate his personal employment matter into a "cause celebre." This is unpersuasive because the button at issue here does not implicate any <u>personal</u> employment matter.

[48] <u>CWA II</u>, 241 F. Supp. 2d at 631.

incident or on a prior occasion when approximately 30 Hospital employees wore the buttons.[49]  Finally, as the district court observed, there was no evidence that Herrera's productivity suffered as a result of wearing the button; quite to the contrary, he received consistently positive performance evaluations, with the lone exception of the dress code violation.[50]

The instant situation differs markedly from, for example, Connick v. Myers, in which the speech at issue involved an assistant district attorney's distribution during work hours of a questionnaire that was critical of that professional's supervisors.[51]  Here, as emphasized by the district court, Herrera's mute lapel-pin speech was not a public criticism of a close supervisor or a challenge to the Hospital's authority; neither did it pose any threat whatsoever to the efficient performing of the Hospital's medical or administrative functions.[52]  Obviously, the particular work environment in Connick was a key factor.  The Supreme Court emphasized that maintaining harmonious relationships is essential to efficiency in a district attorney's office, which is, after all, tantamount to a government law firm.  A custodial or

---

[49] See CWA I, 241 F. Supp. 2d 601, 613 (E.D. La. 2002).

[50] See Id.; CWA II, 241 F. Supp. 2d at 630-31.

[51] 461 U.S. 138, 153 (1983).

[52] CWA II, 241 F. Supp. 2d at 631.  As the district court explained, these are all types of speech that have been permissibly infringed by public employers under the Pickering/Connick test, but Herrera's speech falls into none of these categories.

24

maintenance worker, such as a carpenter, wearing a pro-union button during his work shift cannot be analogized to a doctor, nurse, technician, or administrator employed by a medical center, just as such a maintenance worker cannot be analogized to an assistant district attorney or deputy sheriff. In sum, Herrera's speech on a matter of public concern outweighs any effect it might have on the Hospital's providing services to the public. Herrera passes the Pickering/Connick balancing test with flying colors.

4. Speech as a substantial or motivating factor.

This brings us to the third step in our testing. On the question whether Herrera's speech was a motivating factor for his punishment, the district court emphasized that the Hospital had essentially conceded this point in its Trial Brief when it stated: "If Plaintiff Herrera had removed the button from his uniform on any of the numerous occasions he was asked to do so by his supervisors, he would not have been disciplined."[53] Furthermore, noted the district court, other circuits have concluded that "refusing to obey an order that implicates an employee's First Amendment rights is not a sufficient reason for disciplining the

---

[53] See CWA II, 241 F. Supp. 2d at 627. The court also observed that, even though the Hospital would say that quotation is out of context, that it was meant to demonstrate that Herrera was punished for insubordination, the statement is nonetheless "an unequivocal admission" that the button was a "substantial motivating factor" in the adverse employment action.

25

employee."[54] And, the lack of disciplinary action meted out to employees who knuckled under and removed their buttons demonstrates beyond cavil that the continued wearing of the button in violation of the dress code was at least a motivating factor behind Herrera's discipline, notwithstanding the Hospital's strenuous contentions to the contrary. After all, the only employee disciplined was Herrera, who was the only employee who continued to wear the button.[55]

But even if we concede arguendo that insubordination too was "a" cause of the adverse employment action (which we address more fully below), none can contend, at least not in full candor, that insubordination was the sole reason. Stated differently, the record evidence establishes beyond peradventure that Herrera's protected speech was also a (if not the) motivating factor.

5. Would the adverse employment action have been taken absent Herrera's protected speech?

Independently, Herrera's employment file provides the answer to the question whether he would have suffered the adverse employment action but for the protected speech. His employment record contains no negative marks, comments, or references to any

---

[54] CWA I, 241 F. Supp. at 614. (quoting Dunn v. Carroll, 40 F.3d 287, 291 (8th Cir. 1994), accord Leonard v. City of Columbus, 705 F. 2d 1299, 1305 (11th Cir. 1983).

[55] The confrontation with Durham, occurring as it did after repeated unconstitutional commands to remove the button, does not negate the importance of the button in motivating the adverse employment decision, a point we discuss further infra.

other incidents of misconduct whatsoever. And, even though that record on its face indicates that Herrera was disciplined for "insubordination," it goes on to make abundantly clear that the insubordination for which he was punished arose from Durham's thrice-repeated, unconstitutional order to correct a dress code violation.[56] The record even notes the dress code's policy number. Under these circumstances, it is specious at least — mendacious at most — for the Hospital to contend "that it would have reached the same [employment] decision ... in the absence of the protected

---

[56] It is important to note that the confrontation in the cafeteria had not escalated to the point at which an altercation might have occurred. Herrera's coworker, Gerardo Medrano — the only disinterested witness, as he was no longer employed by the Hospital by the time of the trial — testified first that Herrera was not angry during the confrontation. After prodding by defense counsel, he conceded that Herrera was "kind of" angry, but on cross-examination Medrano made clear that any tension involved in the confrontation was incited by Durham and another supervisor, Daniels:

> Q: ... Wasn't Mr. Berry's question [from the deposition] "Okay. So, he was kind of angry?"
> A: Yes, sir.
> ...
> Q: And then Mr. Berry's next question on line 15 was, "And he said that kind of in anger". Did I read that right?
> A: Yes, sir.
> Q: All right. Now, who showed anger first in that little confrontation in the cafeteria? Who showed anger first? Mr. Durham or Mr. Herrera?
> A: John Durham and Mr. Daniels.
> Q: Okay. And who showed – Who seemed more angry? Mr. Durham or Mr. Herrera?
> A: John Durham and Tim Daniels.
> Q: Did they both seem more angry than Mr. Herrera?
> A: Yes, sir.

27

conduct."[57]  Like Poor Richard's proverbial horse-shoe nail, if Herrera had not engaged in the protected speech, he would not have been ordered to cease; if he had not been so ordered repeatedly, he would not have repeatedly refused to cease; if he had not repeatedly (and increasingly emphatically) refused to cease, the charge of "insubordination" and the ensuing adverse employment decision would never have been made.[58]  This is a generous characterization, as the claim that insubordination was <u>the</u> motivation for the disciplinary action has the distinct ring of provocation and post-hoc rationalization.

The Hospital's attempt to cast its adverse action as disciplining Herrera <u>only</u> for insubordination, which action would have been taken regardless of the protected speech, proves too much.  Under this theory, any public employer could stifle the First Amendment speech rights of employees with impunity.  If an employer wanted to stop an employee from engaging in constitutionally protected speech (that is, speech on a matter of

---

[57] <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977).

[58] The absurdity of the Hospital's position on this question is illustrated by its Motion to Dismiss, in which it cannot keep its own story straight.  On the one hand, the Hospital asserts that "Mr. Durham informed Plaintiff Herrera that <u>if he violated the dress code policy</u> again, he would be reprimanded.  Plaintiff Herrera stated that he understood the <u>consequences of violating the dress code policy</u> ...." (emphasis added).  Later in the same document, however, the Hospital argues that "It was <u>not the alleged 'speech' or even his violation of the dress code policy</u> that precipitated the disciplinary action." (emphasis added).

28

public concern that does not impede the employer's efficient operation), it need only order the employee to cease. If the employee obeys, the employer has succeeded in quashing protected speech; if the employee refuses, he has been insubordinate and is subject to being fired or suspended, thus again stopping the protected speech. This would be "win-win" for public employers interested in quashing protected speech, but it would be "lose-lose" for the First Amendment.

Still the Hospital protests that it was not Herrera's continued breach of the dress code and refusal to desist that constituted the insubordination; rather, it was his "fighting words" ("I'm not going to take it off. If you want it off, then you take it off") to Durham for which he was disciplined. Not only does Herrera's employment record put the lie to this pretextual explanation by referring to the dress code by policy number; the record facts eschew the Hospital's attempt to portray the incident as some highly charged "belly bumping" altercation. There was no indication at trial that Herrera had been insubordinate or disruptive in any way on the day of his suspension, other than in the brief, Durham-provoked confrontation. That episode clearly was incited (or exacerbated) by Durham himself.[59] Under these circumstances, it is obvious that the adverse employment action would not have occurred "but for" the protected speech and the

---

[59] See note 54, supra.

supervisor's persistant, unconstitutional efforts to squelch that speech.

C. <u>Alleged Procedural Errors</u>

1. Arguments insufficiently briefed.

The Hospital contends on appeal that the district court failed to complete the <u>Pickering</u>/<u>Connick</u> balancing test analysis when considering the parties' motions for summary judgment, and by shifting the burden of proof at trial, thereby committing error. The Hospital neither makes substantive arguments on these points nor cites relevant case law, presenting nothing more than unsupported conclusional statements. As we have long and repeatedly held that issues inadequately briefed to us are deemed waived, we do not address these two arguments.[60]

2. Jury consideration of "factual" issues implicated in the constitutional test.

As noted above, we find unconvincing the Hospital's substantive arguments that the protected speech at issue — wearing the Union button and refusing to take it off — was not a motivating factor of its adverse employment action against Herrera. As for the procedural question whether the district court rather

---

[60] Fed. R. App. P. 28(a)(9)(A) requires that the Appellant's brief contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." <u>See</u> <u>also</u> <u>L&A Contracting Co. v. Southern Concrete Servs., Inc.</u>, 17 F.3d 106, 113 (5th Cir. 1994)("[Appellant] cites no authority ... on the attorney fee question, however, and we consider the challenge abandoned for being inadequately briefed.").

than the jury was the proper party to decide the two "factual" questions, we agree with Plaintiffs that "it is without question that a district court may on a motion for summary judgment rule as a matter of law that the summary-judgment evidence demonstrates that no genuine issue of material fact exists for trial as to an element essential to the non-moving party's case."[61] Furthermore, according to the district court's analysis of the case, the Hospital had "nowhere indicated that evidence [it] would have offered on these issues at trial would in any material way have differed from that which had already been considered and rejected."[62] Instead, the Hospital continued to insist that Herrera was not disciplined for his dress code violation. Although it is true that these factual questions would normally be for the jury to decide, the district court's actions here are not error in light of the summary judgment evidence on causation.[63]

D.  Injunctive Relief

---

[61] CWA II, 241 F. Supp. 2d 617, 627 (W.D. Tex. 2002), citing Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

[62] CWA II, 241 F. Supp. 2d at 627.

[63] The Hospital also insists that the district court should have ordered a full trial on the merits, instead of limiting the jury trial to the remaining undecided elements of the Pickering/Connick balancing test. The Hospital again neither makes substantive arguments on this point nor cites relevant case law. Thus this argument, if not waived as inadequately briefed, appears frivolous, given the function of the court at the summary judgment stage. See notes 58-59, supra, and accompanying text.

31

The district court concluded that, because the Hospital had failed, under the Pickering/Connick balancing test, to justify the restrictiveness of the dress code, injunctive relief was necessary to prevent the Hospital's future application of the same unconstitutional policy to other employees situated similarly to Herrera. Plaintiffs had originally sought an injunction that would allow all the Hospital's employees to wear pro-union buttons.[64] The district court decided that this would be overbroad, but satisfied itself that a more narrowly tailored injunction covering only those employees who worked in conditions similar to Herrera, i.e., those who work in the Hospital's "Integrated Services" sector and have limited contact and virtually no interaction with the general public, would be appropriate. The district court reasoned quite logically that, as the Hospital has continuously asserted that the wearing of the button and refusal to obey orders to doff it "in no way led to the disciplining of Herrera," it "essentially concede[d] that the message of the button is harmless and does not cause a disturbance."[65]

This was not an abuse of discretion. If the Hospital cannot bar Herrera from wearing the button, neither can it bar similarly situated employees from doing so. An injunction limited to prohibiting the Hospital from enforcing the anti-adornment policy

---

[64] CWA II, 241 F. Supp. 2d at 634.

[65] Id. at 635.

32

against Herrera alone would have the potential of inviting more litigation and squandering more judicial resources. As Plaintiffs point out, this is especially true in light of the Hospital's demonstrated "belligerence" in this case and its dogged refusal to accept (or even address) many of the district court's rulings. We perceive no reversible error in the injunction ruling of the district court as finally tailored.

E.   Attorneys Fees and Costs

The Hospital urges that the district court abused its discretion in awarding fees and costs "because [Plaintiffs'] free speech rights were not violated." But, as we have concluded that Herrera's rights were violated, this argument is plainly unavailing. As a fall-back position, however, the Hospital contends that even if the Plaintiffs are entitled to attorneys' fees, the quantum of the district court's award of fees and costs is not supported by sufficient or credible evidence. This impresses us as being particularly inaccurate when considered in the context of the district court's extensive discussion of how its award was calculated.[66] Furthermore, as that court noted, many of these costs could have been avoided had the Hospital not steadfastly continued its "adamant refusal to deal with the rulings" of the trial court, a litigating posture that the court

---

[66] See CWA II, 241 F. Supp. 2d at 635-38.

33

labeled "a 'fight to the last breath' strategy."[67]   The court further explained:

> Although the attorneys for Defendants were absolutely certain that both judges in this action were completely wrong in their analysis of the issues, it must be observed that, even when lawyers disagree with judges, they normally humor judges enough to address the issues that the judges believe to be important in the matter. Counsel need not adopt a judge's view of a case, but they should, at a minimum, confront it. While declining to do so, as here, illustrates abundant self-confidence, it also elongates a case and adds greatly to its cost ....[68]

This same scorched-earth strategy pervades the Hospital's appeal. It has challenged virtually every factual finding and every legal conclusion made by the district court, no matter how slight or relatively insignificant. Although this strategy may be warranted on rare occasions, in the instant case many of the Hospital's arguments border on the frivolous, and others are insufficiently briefed. The Hospital's "kitchen sink" briefing in this case was ill-advised. Although we refrain from finding this appeal frivolous under Federal Rule of Appellate Procedure 38, as requested by Plaintiffs, we are well satisfied that the Hospital's conduct in this matter and Plaintiffs' supporting documentation provide ample support for the district court's extensive analysis and ultimate amount assessed for attorneys' fees. We discern no abuse of discretion, and thus no reversible error.

### III.  Conclusion

---

[67] CWA II, 241 F. Supp. 2d at 635.

[68] Id.

The infringement on Herrera's rights in this case was inflicted pursuant to an official Hospital policy. Given its content and its context, i.e., during the course of an ongoing union organization effort, Herrera's wearing of the lapel pin was speech on a matter of public concern. And, although the Pickering/Connick balancing test allows public employers to ban inflammatory or disruptive speech in legitimate efforts to ensure the efficient delivery of services, the Hospital has not produced any probative evidence demonstrating that the wearing of a "Union Yes" button by a carpenter or other member of the Integrated Services subset of its employees is the kind of speech that has produced, or is likely to produce, such deleterious effects. Finally, we see the Hospital's dogged insistence that Herrera was disciplined solely for insubordination —— and not at least in significant part for a dress code violation —— to be contrived and disingenuous sophistry at best, and mendacious at worst. We likewise conclude that the Hospital's complaints about the procedural rulings of the district court and its award of attorneys' fees are without merit, in no way approaching the level of abuses of discretion. For the foregoing reasons, the district court's judgment is, in all respects,

AFFIRMED.

GARWOOD, Circuit Judge, dissenting.

I respectfully dissent.

As always, we must properly understand what is, and what is *not*, before us. What *is* before us is a combined partial summary judgment and a judgment as a matter of law holding unconstitutional a local government's nondiscriminatorily applied content and viewpoint neutral uniform non-adornment policy applicable to its employees while on duty.[69] What is *not* before us is whether a governmental employer may discipline an employee for advocacy of better working conditions, *cf*. *McGill v. Board of Education*, 602 F.2d 774, 778 (7th Cir. 1979) ("advocacy of a collective bargaining agreement in the teachers' lounge and in an open meeting of the school board"), or for belonging to a union, *or* because a union was the subject matter addressed by the adornment the employee wore on his uniform at work *or* because the viewpoint expressed thereby was pro-union.

It is clear that with respect to restrictions on First Amendment rights "the government as employer indeed has far broader powers than does the government as sovereign" and "even many of the

---

[69]Under the hospital's policy, all employees were required to wear a uniform while on duty. The required uniform for carpenters (such as Herrera), electricians, cabinet-makers and plumbers, consists of a gray shirt and gray pants. The policy provides that "ONLY pins representing the professional association and the most current hospital service award may be worn." It is also provided that the dress code will be enforced "uniformly throughout Medical Center Hospital."

most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees." *Waters v. Churchill*, 114 S.Ct. 1878, 1886 (1994). "On the other hand, 'the threat of dismissal from public employment is . . . a potent means of inhibiting speech,'" (quoting *Pickering v. Board of Education*, 88 S.Ct. 1731, 1737 (1968)), and a "balancing" is thus called for "to accommodate the dual role of the public employer." *Rankin v. McPherson*, 107 S.Ct. 2891, 2897 (1987). This is so *because* it "is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but *simply because superiors disagree with the content of employees' speech*." *Id.* (emphasis added). That concern is *not implicated here*, but it has been present throughout the Supreme Court's *Pickering* line of cases.[70] This likewise true

_____

[70]*See, e.g., Pickering v. Board of Education*, 88 S.Ct. 1731, 1732-33 (1988) (teacher's letter to newspaper criticizing Board of Education's school finance proposal); *Perry v. Sindermann*, 92 S.Ct. 2694, 2696 (1972) (college teacher's legislative testimony supporting position opposed by college's board of regents); *Mt. Healthy City* Board of Ed. v. Doyle*, 97 S.Ct. 568, 573 (1977)(teacher's telephone call to radio station conveying substance of memorandum relating to teachers' dress and appearance and "his criticism"); *Givhan v. Western Line Consolidated School Dist.*, 99 S.Ct. 693, 695 (1979) (teacher's criticism to principal of school district's racially discriminatory policies and practices); *Connick v. Myers*, 103 S.Ct. 1684, 1693 (1983) (assistant district attorney's questionnaire circulated in office which impliedly criticized district attorney and supervisors); *Rankin v. McPherson*, 107 S.Ct. 2891, 2900 (1987) ("it is undisputed that he fired McPherson based on the *content* of her speech"). *See also Waters v. Churchill*, 114 S.Ct. 1878, 1884 (1994) (nurse's criticism of employer hospital's violation of state nursing

with respect to this court's decisions applying *Pickering* and its progeny.

When, however, the governmental employer's regulation of employee First Amendment protected expression is by nondiscriminatory and content/viewpoint neutral general regulation, the balancing process is far more heavily tilted in favor of the government even where the First Amendment protected activity is of the kind most clearly and strongly a matter of public concern. That is evident in the Supreme Court's decisions upholding the Hatch Act, restricting a broad range of partisan political activities of *all* federal civil service employees, and its Oklahoma analog applicable to all that state's civil service employees. *United States Civil Service Commission v. National Association of Letter Carriers*, 93 S.Ct. 2880 (1973); *Broadrick v. Oklahoma*, 93 S.Ct. 2908 (1973). In *Broadrick* the Court observed that "[u]nder the decision in *Letter Carriers* there is no question that . . . [the Oklahoma statute] is valid at least insofar as it forbids classified employees from [*inter alia*] . . . addressing or taking an active part in partisan political rallies or meetings; soliciting votes . . .; participating in the distribution of partisan campaign literature; . . . circulating partisan nominating petitions . . . ." *Broadrick*, 93 S.Ct. at 2918. The Court obviously recognized that these statutes restricted First Amendment

---

regulations and the quality of nursing care provided patients).

38

protected freedom of speech directly on and closely involving matters which could not be more clearly of the very strongest public concern.[71]  Indeed, few if any matters can be of more *public* concern than elections, or more closely and directly related thereto than addressing a political rally, soliciting votes, or distributing campaign literature.  Nevertheless, the Court sustained those statutes and did so even though they extended to the lowest level civil service employees, without regard to whether their government positions involved any policy making or discretion or any contact or interaction with the public, or whether while engaging in the proscribed expression the employee was identified (or likely to be known) as a government employee, or whether while so engaged the employee was on duty or on any government property, and without regard to whether the election in question was one to

---

[71]*See Broadrick*, 93 S.Ct. at 2918 (the state statute "is directed, by its terms, at political expression which if engaged in by private persons would plainly be protected by the First and Fourteenth Amendments"); *Kelley v. Johnson*, 96 S.Ct. 1440, 1445 (1976) ("we have sustained comprehensive and substantial restrictions upon activities of both federal and state employees *lying at the core of the First Amendment*," citing *Letter Carriers* and *Broadrick*; emphasis added).

a federal office (in *Letter Carriers*).[72]  In so holding, the Supreme

Court stressed that:

> "The restrictions . . . imposed on federal employees are
> not aimed at particular parties, groups, or points of
> view, but apply equally to all partisan activities of the
> type described.  They discriminate against no racial,
> ethnic, or religious minorities.  Nor do they seek to
> control political opinions or beliefs, or to interfere
> with or influence anyone's vote at the polls."[73]

I am willing to assume, *arguendo*, that the wearing of the

"Union Yes" button was speech on a matter of public concern.  But

if that is so, it is so only in a very weak and attenuated sense.

The "speech" only occurs only during the course of employment and

not in anything considered a public forum, and it addresses no

---

[72]In *Wachsman v. City of Dallas*, 704 F.2d 160, 171 (5th Cir. 1983), we noted that "[v]irtually all the numerous restrictions on federal employee political activity upheld in *Letter Carriers* . . . apply as much to strictly state and local elections and political affairs as to elections for federal office and political activities attendant thereto."

*Wachsman* likewise held that the rationale of *Letter Carriers* and *Broadrick* applied to non-partisan candidate elections and to employee contributions.  *Wachsman*, 704 F.2d at 164-75.  The city ordinance challenged in *Wachsman* also involved, among other provisions, a prohibition against any city employee wearing "city council campaign buttons . . . at work or in a city uniform or in the offices or buildings of the City;" the City employees challenging the ordinance did not, however, challenge that provision.  *Wachsman*, 704 F.2d at 162.  *See also, e.g., Bart v. Tel Ford*, 677 F.2d 622, 624 (7th Cir. 1982) (no first amendment violation to require employee to take leave of absence before running for city office where not aimed at particular groups, parties or points of view).

[73]*Letter Carriers*, 93 S.Ct. at 2890.  *See also Broadrich*, 93 S.Ct. at 2918 (the challenged act "is not a censorial statute, directed at particular groups or viewpoints . . . The statute, rather, seeks to regulate political activity in an even-handed and neutral manner").

specific matter.  It certainly does not even impliedly address any corruption, violation of law, misconduct or malfeasance on the part of the hospital or any one else.  Nor does it even impliedly address any potential employee election to choose the union as bargaining representative for any of the hospital employees, or any potential "recognition" of the union by the hospital, or any potential contract between the employees and the hospital or any potential strike or organized work stoppage by such employees.[74]

---

[74]Under Texas Government Code § 617.002, "a political subdivision . . . may not enter into a collective bargaining agreement with a labor organization regarding wages, hours, or conditions of employment of public employees" *and* "a political subdivision . . . may not recognize a labor organization as the bargaining agent for a group of public employees."  *Id*. (b).  "Public employees may not strike or engage in an organized work stoppage."  *Id*. § 617.003(a).  Further, "[a]n individual may not be denied public employment because of the individual's membership or non membership in a labor organization."  *Id*. § 617.004.

The foregoing provisions of Texas law do "not impair the right of public employees to present grievances . . . either individually or through a representative."  *Id*. § 617.005.  "Representative" as used in the statute is not restricted to unions or union members but includes persons who are neither.  *Sayre v. Mullins*, 681 S.W.2d 25 (Tex. 1984).  As we explained in *Moreau v. Klevenhagen*, 956 F.2d 516, 520 (5th Cir. 1992), *aff'd*, 113 S.Ct. 1905, 1909 n.10 (1993):

> "Presentation of grievances is acceptable under Texas law because it is a unilateral procedure under which the employee can be represented by anyone he or she chooses, be it a lawyer, clergyman, union or some other person or organization.  Texas law prohibits any bilateral agreement between a city and a bargaining agent, whether the agreement is labeled a collective bargaining agreement or something else.  Under Texas law, the County could not enter into *any* agreement with the Union."

This is largely in contrast to the situation of Federal agencies and their employees governed by the Federal Service-Labor Management Relations Statute, 5 U.S.C. §§ 7101-7135, under which unions that have won an election supervised by the Federal Labor Relations Authority are certified as the exclusive bargaining agent

41

While the "Union Yes" button may implicitly express the view that the hospital employee wearing it believes working conditions and/or compensation there would be better for him or her, and perhaps similarly situated fellow employees, if more hospital employees were union members, it is less than clear what, if anything, else is implied. It is the purest speculation to suggest anything more. In determining whether speech is as a matter of public concern we look to the "speech" allegedly giving rise to the complained of action by the governmental employee, not some other speech. *See, e.g., Waters*, 114 S.Ct. at 1891. Not everything that concerns discipline or morale in a governmental office is of public concern, and "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 103 S.Ct. at 1691. As we have frequently held, "[c]ommunication thus rises to the level of public concern if a person speaks *primarily* as a citizen rather than as an employee." *Dorsett v. Board of Trustees For State Colleges*, 940 F.2d 121, 124 (5th Cir. 1991) (emphasis added). As noted, if Herrera's violation of the uniform anti-adornment policy meets this test, it does so only minimally. In such a situation the government's burden in

of the employees and the agency is under a duty to bargain collectively with the union (subject to certain reserved management rights). *See, e.g.,* 5 U.S.C. §§ 7111, 7114, 7116. However, strikes and work stoppages are prohibited. § 7116(b)(7). The contrast is, of course, even greater with respect to unions and employers governed by the National Labor Relations Act.

justifying its action is correspondingly reduced, as we explained in *Department of Justice v. FLRA*, 955 F.2d 998, 1006 (5th Cir. 1992) ("*FLRA*"):

> "'[T]he State's burden in justifying a particular [action or policy] varies depending upon the nature of the employee's expression.' *Connick* [*v. Myers*], 461 U.S. [138] at 150, 103 S.Ct. at 1692 [1983]. 'The more central a matter of public concern the speech [or association] at issue, the stronger the employer's showing of counter-balancing governmental interest must be.' *Coughlin* [*v. Lee*], 946 F.2d [152] at 1157 [5th Cir. 1991]."

Certainly an employer has a legitimate interest in establishing a uniform policy for its on duty employees. We recognized such an interest in *FLRA, supra*, as well as in *Daniels v. City of Arlington*, 246 F.3d 500, 504 (5th Cir. 2000). While those cases involved law enforcement personnel, we have never held that a content neutral uniform policy advances no legitimate interest of a non-law-enforcement public employer in promoting the efficiency of its services. A "uniform requirement fosters discipline, promotes uniformity, encourages *esprit de corps*, and increases readiness" and standardized uniforms encourage the subordination of personal preferences and identities in favor of the overall group mission. *INS v. Federal Labor Relations Authority*, 855 F.2d 1454, 1464 (9th Cir. 1988). There is no reason to believe that a uniform policy will not have similar efficiency promoting effects in the non-law-enforcement context. Moreover, as observed in *INS v. Federal Labor Relations Authority*, *supra*,

43

"To allow employees to adorn their uniforms with objects of their own choosing undermines the very purposes that uniforms serve." *Id*. at 1464.

. . .

". . . the management interest in requiring unadorned uniforms has been recognized in private sector cases as well. The Sixth Circuit has recognized that concerns over discipline and presenting a clean professional image justified a private employer in prohibiting its restaurant employees from wearing unauthorized union buttons on their official uniforms. *Burger King v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984). Similarly, in *Harrah's Club*, we recognized that a private employer was justified in prohibiting its casino employees from wearing unauthorized union buttons on their official uniforms. *See Harrah's Club*, 337 F.3d [177] at 178-79 [9th Cir. 1964)]. *Id*. at 1465.

We have recognized that "a union button" worn on duty "can be interpreted as a symbol of defiance of supervisors and as a split in solidarity among union and non-union" employees "which will have an [adverse] impact on mission, discipline and esprit de corps." *FLRA*, 955 F.2d at 1007. There is no reason to think that this is not equally true respecting hospital employees. Moreover, our above quoted assumptions about the effects of uniform adornment in *FLRA* were made despite the fact that the employer "has not demonstrated with anecdotal evidence that these deleterious effects will in fact occur." *Id*. We justified that by stating:

"The Supreme Court, in *Connick*, held, however, that it is not necessary 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of the working relationship is manifest before taking action.'" *FLRA* at 1007 (quoting *Connick*, 103 S.Ct. at 1692).

44

*Here,* by contract, there *is* anecdotal evidence that the wearing of union buttons *does* give rise to strong and hostile workplace emotions and confrontations. When told on a second occasion to take off his button, Herrera "got upset," became "very disrespectful," almost "hostile," and replied to his supervisor that "if you want to take it off, you take it off" – a remark that any reasonable fact finder could easily conclude was an invitation to physical confrontation. The supervisor wisely declined the invitation and testified that he then "offered him [Herrera] to just go to my office, then Mr. Herrera stood up and jabbed his fist in the air very defiantly and yelled 'Union Up.'" All this occurred in the hospital cafeteria, in the presence of other employees, visitors and patients.[75]

---

[75]The majority's statement that "[i]t is important to note that the confrontation in the cafeteria had not escalated to the point at which an altercation *might* have occurred" (emphasis added), is nothing more than the purest appellate fact finding, as is its strained characterization of the witness Medrano as "disinterested." Medrano, who likewise wore a "union yes" button, and had been a co-employee and co-union member with Herrera, testified he was "good friends" with Herrera, that he had visited in Herrera's home and they were "such good friends" that he would consider Herrera "like a brother." Moreover, portions of Medrano's trial testimony were shown to be inconsistent with his deposition testimony in several respects. For example, Medrano clearly testified that when Herrera said "I'm not going to take it off, you take it off" Herrera was *not* "angry." Only when confronted with his contrary deposition testimony (in which he replied "Yes, sir" when asked, respecting the same statement, whether Herrera "said that in anger"), did Medrano back off and attempt another route to throw blame on the supervisors.

45

Moreover, in *FLRA* we also relied on the fact that the uniform anti-adornment policy "results in only a minimal intrusion of the free speech rights of union employees" who "can continue to express their support for the union in myriad other ways unaffected by" it. *Id*. at 1007. The same is equally true in the present case.

There is also, as we noted in *FLRA*, the governmental employer's legitimate interest in projecting "an appearance to the public of neutrality and impartiality." *Id.* at 1007. While this interest may well be at its strongest in the context of law enforcement personnel, it is certainly not categorically absent otherwise. Certainly Hospital employees such as Herrera are seen – indeed regularly seen – by patients and visitors and other members of the public. The cafeteria in which they eat and take their twice a day breaks are likewise used by patients, visitors and other members of the public; they ride with members of the public in the elevators, and pass them in the halls and on the stairs. There are some, albeit comparatively infrequent, occasions when they perform their work in then occupied patient rooms. The majority stresses "the difference between contact and interaction." There is a difference, but that does not mean that contact is not relevant, only that true interaction is likely more so. After all, any reasonable patient, visitor, or other member of the public, and any reasonable co-employee, will understand the button with the written message on it as an attempt by its wearer to communicate

46

the content of the message to those with whom he comes into contact (such as by riding with them in the elevator or passing them in the halls or sitting at the cafeteria table next to them) not simply, or even primarily, those with whom he interacts. *That*, of course, is the *point* of the button. These buttons are wholly unlike what the speaker believes to be only a private conversation with a close friend, as in *Rankin*. How are patients or visitors (or co-employees) to feel when they see many on duty employees wearing buttons on their hospital uniform saying, for example, "Deport Illegals NOW" or "Abortion is Murder" or "Unions Steal," all relating to issues of at least as much public concern as "Union Yes." It makes little sense, and surely runs contrary to *Connick*, to suggest that the employer must wait until public, or co-employee, dissatisfaction or disharmony has manifested itself before prohibiting such on duty display. On the other hand, to *even then* single out for prohibition one, or a few, particular button messages raises its own substantially more serious concerns, namely that the prohibition is made "because superiors disagree with the content of" the message, *Rankin*, 107 S.Ct. at 2897, or because the message is not "politically correct" or simply because the message is unpopular.

For example, in *Police Department of City of Chicago v. Mosley*, 92 S.Ct. 2286 (1972), the Court held unconstitutional a city ordinance prohibiting all picketing within 150 feet of a

47

school, *except* peaceful picketing of a school involved in a labor dispute.  The Court stated:

> "The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter.  Peaceful picketing on the subject of a school's labor-management dispute is permitted, but all other peaceful picketing is prohibited.  *The operative distinction is the message on a picket sign*.  But, *above all else, the First Amendment* means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Id*. at 2290 (emphasis added).

The *Mosley* Court went on to quote the views expressed in Justice Black's concurring opinion in *Cox v. Louisiana*, 85 S.Ct. 453, 470 (1965), that

> "'[B]y specifically permitting picketing for the publication of labor union views [but prohibiting other sorts of picketing], Louisiana is attempting to pick and choose among the views it is willing to have discussed on its streets.  It thus is trying to prescribe by law what matters of public interest people whom it allows to assemble on its streets may and may not discuss.  This seems to me to be censorship in a most odious form, unconstitutional under the First and Fourteenth Amendments. . . .'" *Mosley*, 92 S.Ct. at 2291 (quoting *Cox*, 85 S.Ct. at 470, Black, J., concurring).

*Mosley* then states "we accept Mr. Justice Black's quoted views."

*Id*.  *Mosley* likewise explains that:

> "In this case, the ordinance itself describes impermissible picketing not in terms of time, place and manner, but in terms of subject matter.  The regulation thus slip[s] from the neutrality of time, place, and circumstance into a concern about content.  This is never permitted."  *Mosley* at 2292 (internal quotation marks and footnote omitted).

Finally, the clear – indeed the necessary – inference of the decisions in *Letter Carriers*, *Broadrick* and *Wachsman* is that in any balancing of interests the content and viewpoint neutral nature of the governmental employer's challenged restriction weighs heavily in favor of its validity.[76]

The net effect of these basic principles, it seems to me, is that the approach which both best protects core First Amendment values and also gives appropriate recognition to the government's interests as employer, is to sustain content and viewpoint neutral employee on duty uniform anti-adornment policies, which leave open myriad other means and avenues of employee expression, *rather* than requiring the employer *either* to allow virtually all messages to be added to employee uniforms worn at work *or* to pick and choose on the basis of the particular message language and the mission related effects of that particular expression which the employer anticipates and/or has experienced. Certainly no decision of the

---

[76]That, of course, does not mean that *all* content and viewpoint First Amendment restrictions imposed by a governmental employer on its employees are valid. There must be some rational nexus to the employment. For example, in *U.S. v. National Treasury Employers Union*, 115 S.Ct. 1003 (1995), the Court held invalid a preclusion of *any* federal employee from accepting *any* compensation for making (or writing) *any* speech or article even though made or written off duty, concerning a subject with no connection to the employee's duty and paid by a person or group having no such connection. *Id.* at 1008. Here by contrast the neutral uniform anti-adornment policy applies only to employees while on duty.

Supreme Court or of this court commands a different result or approach than that here advocated.[77]

It is indeed a jurisprudence gone badly astray which precludes the nondiscriminatory, evenhanded application of the hospital's content and viewpoint neutral uniform anti-adornment policy to the wearing of "Union Yes" buttons on duty, but at the same time, under *Letter Carriers*, *Broadrick* and *Wachsman*, permits the Hospital District to adopt and even handedly enforce a content and viewpoint neutral regulation forbidding all its employees from, even when off duty, addressing a political rally for an election to the Hospital District's Board or handing out campaign literature for such an election, matters of much *more* public concern, but far *less* closely related to employment, than the adornment with "Union Yes" buttons of employee uniforms worn at work.[78]

---

[77]I recognize that the majority's rationale and result here does find support in *Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999), and in language in *American Fed'n of Gov't Employees v. Pierce*, 586 F.Supp. 1559 (D.D.C. 1994), although the latter decision rested primarily on the ground that the restriction in question was precluded by the plain language of the governing regulation. 586 F.Supp. at 1651. However, I respectfully disagree with the analysis in these opinions which fails to address the neutrality principles emphasized in *Letter Carriers* and *Mosley*, and the fact that the Supreme Court's *Pickering* line of cases, at least so far as they deal with workplace expression, relate to content/viewpoint based retaliation or restriction.

[78]Ironically, the majority (footnote 25) finds comfort in the fact that one union member had run "for a position on the ECHD Board."
The majority also contends (footnote 40) that the hospital's allowing the wearing of the pins of two local high schools "at the time of their annual football showdown" renders "especially hollow"

We are taking a seriously wrong fork in the road. I respectfully dissent.[79]

_____

its "'esprit de corps/unity argument" and "smacks of" content based discrimination. This contention wholly fails the common sense test. Nor is there any evidence that wearing such pins once a year would tend to (or ever did) undermine employee *esprit de corps* or unity or would likely do so about as much as a whole range of other possible button messages, including "Union Yes" and many others addressing more truly serious matters than who wins a high school football game. Nothing is added by citing the 1990 *Bissinger* book – a strictly popular, non-peer reviewed, non-academic or scientific writing (which was not judicially noticed below) – for the proposition that the rivalry is "famously intense." If we are going to indulge in that sort of questionable practice, we might do better to note the sworn testimony in such cases as, for example, *Scott v. Moore*, 680 F.2d 979 (5th Cir. 1982), *rev'd*, 103 S.Ct. 3352 (1983). The essentially silly football pin once a year type argument has, so far as I am aware, been uniformly rejected by the courts which have addressed it. *See, e.g., INS v. Federal Labor Relations Authority*, 855 F.2d at 1465; *Burger King v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984). If local government means anything, we must, in the absence of clear contrary evidence, defer to the local hospital's implicit decision that the once a year wearing of local high school pins fostered employee morale and did not tend to undermine employee unity or *esprit de corps*, or public perception of neutrality, as would the wide range of other buttons.


[79] A brief rejoinder to the majority's replies to this dissent.

The majority (note 11) likens this case to *Mosely*, but neglects to note *Mosely's* holding that "*[t]he central problem* with Chicago's ordinance is that" by its terms "[p]eaceful picketing on the subject of a school's labor-management dispute is permitted, but *all* other peaceful picketing is prohibited." *Id.*, 92 S.Ct. at 2290 (emphasis added). The majority apparently thinks that because the blanket uniform non-adornment policy (which neither specifies nor even suggests *any* particular prohibited subject matter) allows "pins representing the professional association and the most current hospital service award" and also once a year wearing of local high school pins, that it is the equivalent of a policy barring *only* specified subject matter. In my opinion, that approach unrealistically trivializes – and in practical effect destroys – the fundamental distinction between content/viewpoint

51

points of view," *Letter Carriers*, 93 S.Ct. at 2890, and restrictions imposed "simply because superiors disagree with the content of employees' speech." *Rankin*, 107 S.Ct. at 2897. *See also* note 10, *supra*. The suggestion (majority opinion note 36) that *Letter Carriers* and *Broadrick* are nothing more than standing cases simply misreads those opinions. *See, e.g., Broadrick*, 93 S.Ct. at 2918 ("under the decision in *Letter Carriers* there is *no question* that . . . [the statute at issue] *is valid* at least insofar as it forbids classified employees from . . . addressing . . . partisan political rallies or meetings; participating in the distribution of partisan campaign literature; . . . circulating partisan nominating petitions . . .") (emphasis added); *Kelley*, 96 S.Ct. at 1445 ("we have sustained comprehensive and substantial restrictions upon activities of both federal and state employees *lying at the core of the First Amendment*," citing *Letter Carriers* and *Broadrick*;) (emphasis added).